Mary D. ANDRA, Plaintiff,

v.

Samuel R. BLOUNT, Meadowcraft, Inc., Timothy M. Leroy, T. Morris Hackney, James M. Scott, Reese H. McKinney, Jr., and MWI Acquisition Co., Defendants.

Civ. A. No. 17154.

Court of Chancery of Delaware, New Castle County.

Submitted: March 23, 2000.

Decided: March 29, 2000.

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, Wilmington; Ann Miller, Michael D. Donovan, of Donovan Miller, Philadelphia, Pennsylvania, of counsel, for Plaintiff.

A. Gilchrist Sparks, III, Jessica Zeldin, of Morris, Nichols, Arsht & Tunnell, Wilmington; Gary W. Kubek, Colby A. Smith, Jeffrey I. Lang, of Debevoise & Plimpton, New York City, of counsel, for Defendants Samuel R. Blount, Timothy M. Leroy and MWI Acquisitions Co.

Anne C. Foster, Thad J. Bracegirdle, of Richards, Layton & Finger, Wilmington; J. Michael Rediker, of Ritchie & Rediker, Birmingham, Alabama, of counsel, for Defendants T. Morris Hackney, James S. Scott, Reese H. McKinney, Jr., and Meadowcraft, Inc.

OPINION

STRINE, Vice Chancellor.

In this opinion, I conclude that a non-tendering stockholder with appraisal rights who is squeezed out in a back-end,

cash-out merger after a tender offer may not challenge the disclosures issued in connection with that tender offer when the tender offer was effected by a majority stockholder who already possessed the voting power to force the back-end merger. In this scenario, the non-tendering stockholder can allege no personal harm caused to her by the allegedly inadequate disclosures. Therefore, dismissal of her disclosure claims is appropriate.

In contrast, however, the non-tendering stockholder may pursue her claim that the back-end merger price was rendered unfair by breaches of fiduciary duty by the director-defendants, who include the majority stockholder. Even though the plaintiff has indicated that "damages equivalent to the appraised value of [her] stock" would afford her "complete relief for the wrongs complained of in this action," [1] the import of binding case law such as *Rabkin v. Philip A. Hunt Chemical Corp.*[2] and *Cede & Co. v. Technicolor, Inc.* ("*Cede II*")[3] is that a minority stockholder *with* appraisal rights should have no less access to a full remedy than a minority stockholder without appraisal rights.

In this unfair dealing action, the non-tendering stockholder may spread her litigation costs over any classwide recovery and may obtain an order requiring the defendants to pay her attorneys' fees, thus making it easier for her to find legal representation and enabling her the possibility of a full recovery. If relegated to an appraisal action, the non-tendering stockholder will have to cover her attorneys' fees out of any recovery she (and the usually smaller group of appraisal petitioners) obtain and will be unable to proceed as a class representative on behalf of all similarly situated stockholders. Because a plaintiff without appraisal rights would be able to pursue an unfair dealing claim on a class action basis and seek recovery of her attorneys' fees, it would be inconsistent with *Rabkin* and *Cede* to deny a plaintiff with appraisal rights that same opportunity. Although reasonable minds can differ on the policy wisdom of this approach, it is the one that I as a trial judge must adopt because it is the one most consistent with a faithful reading of our Supreme Court's teachings in this area.

### I. *Procedural Background*

The defendants in this action—the directors of Meadowcraft, Inc., Meadowcraft itself, and MWI Acquisition Co., a corporate entity used by Meadowcraft's majority stockholder as an acquisition vehicle—seek dismissal of this case on the grounds that the plaintiff, Mary D. Andra: (1) lacks standing to challenge the adequacy of disclosures issued in connection with a tender offer in which Andra did not tender; and (2) is relegated to an appraisal action in challenging the price of the back-end merger in which she was squeezed out as a Meadowcraft stockholder.

The tender offer/back-end merger at issue here was initiated by Meadowcraft's then 73% owner, director, chairman, and chief executive officer, defendant Samuel R. Blount, in May 1999. At that time, Blount offered to buy each of the Meadowcraft shares he did not own for $10 a share. To the extent that he did not receive a tender from each Meadowcraft stockholder, Blount announced his intention to cash out the non-tendering stockholders through a merger that—once recommended by the Meadowcraft board and put to the stockholders for their approval—he had the votes to effect.

1. Pl. Letter to the Court, at 1 (June 7, 1999).

2. Del.Supr., 498 A.2d 1099, 1104 (1985).

3. Del.Supr., 634 A.2d 345, 367 (1993).

After the announcement of these proposed transactions, Andra brought an action alleging that the disclosures issued by the defendants in connection with the tender offer were materially incomplete and misleading. She moved for expedited proceedings to enable the court to consider an application for a preliminary injunction that would prevent the consummation of the tender offer until the Meadowcraft stockholders were provided with adequate disclosures. This court scheduled a preliminary injunction hearing, to be preceded by expedited discovery.

On June 7, 1999, Andra withdrew her request for a preliminary injunction. Her counsel explained this decision as follows:

> The expedited discovery plaintiff has taken to date has confirmed the views of plaintiff and her counsel that her claims are meritorious; however, plaintiff has also concluded that damages would be an adequate remedy for the public shareholders of Meadowcraft . . . .
>
> Plaintiff sought a preliminary injunction in connection with the tender offer for Meadowcraft's public shares by Meadowcraft's 73% shareholder in order to provide Meadowcraft's minority shareholders with material disclosures which would inform their decision whether or not to tender or await the second step merger and seek appraisal. *If plaintiff prevails at trial, damages could be awarded which would be equivalent to the appraised value of Meadowcraft stock thereby giving the shareholders complete relief for the wrongs complained of in this action.* Accordingly,

**4.** Pl. Letter to the Court, at 1–2 (June 7, 1999) (emphasis added).

**5.** The defendants were legitimately confused about whether the second amended complaint sets forth an unfair dealing claim. Nonetheless, Andra contends that she intended to assert such a claim and I find that the facts pled in that complaint support such a claim. At

plaintiff hereby withdraws her application for a preliminary injunction, and the June 15, 1999 hearing can be removed from the Court's calendar.[4]

After Andra abandoned her effort to enjoin the tender offer, the offer closed. Through the offer, Blount acquired enough shares to enable him to cash out the remaining Meadowcraft stockholders through a short-form merger pursuant to 8 *Del. C.* § 253. Andra did not tender into Blount's offer. Rather, she refused the merger consideration and apparently preserved her appraisal rights but eventually did not attempt to prosecute an appraisal action.

## II. The Key Factual Allegations Of The Complaint

Andra's second amended complaint asserts that the defendants breached their fiduciary duties of loyalty and care by: (1) failing to disclose all material facts in connection with the tender offer, and (2) consummating the tender offer/back-end merger on terms unfair to Meadowcraft's minority stockholders.[5] The basic allegations of the complaint that support Andra's claims are as follows:

● Meadowcraft, a producer of casual outdoor furniture, including wrought iron furniture, went public in November 1997—only 17 months before Blount bought back the public's shares. At the time of the initial public offering ("IPO") at $13 a share, Blount touted the long-term earnings prospects of Meadowcraft.

this stage of the litigation, I feel constrained to read her complaint as asserting such a claim. *Cf. Brehm v. Eisner,* Del.Supr., 746 A.2d 244, 266 (2000) (reversing trial court for dismissing with prejudice an 88–page amended complaint the plaintiff never sought to further amend at trial court level).

- In October 1998, Meadowcraft issued a very bullish annual report to its stockholders that suggested that the company's prospects for future earnings growth were favorable, noting that "Meadowcraft Inc. is clearly positioned to be a growth company in 1999 and beyond."[6]

- In late 1998, an investment bank, Interstate/Johnson Lane, a predecessor to Wachovia Securities (both hereinafter referred to as "Wachovia"), was retained to represent a special committee of Meadowcraft directors. In January 1999, Wachovia performed analyses suggesting that the fair value of a share of Meadowcraft stock was in the range of $12.21 to $17.22 (the "January 1999 Wachovia Analyses").

- The January 1999 Wachovia Analyses were done in connection with a third party offer by Masco Corporation of $16 a share for the shares of Meadowcraft held by the public and $13 plus $4 in other consideration for the shares of Blount and Meadowcraft's president, defendant William McCanna, if Meadowcraft hit certain earning targets in the ensuing three-year period. During negotiations with Masco, the special committee insisted that the proposed acquisition be subject to approval by a majority of Meadowcraft's minority stockholders.

- Shortly after the preparation of the January 1999 Wachovia Analyses, Masco and Meadowcraft postponed merger talks. Masco later informed Meadowcraft that it was no longer interested in the transaction.

- On February 10, 1999, Meadowcraft announced the company's second quarter earnings, which were about $6 million lower than in the comparable quarter of the previous year and which reflected lower sales.

- Aside from $1 million in Masco merger discussion-related professional fees, the major causes of this loss of income were disclosed as "the difficulty of factoring certain receivables [which was] expected to continue for the remainder of the fiscal year and recent customer store closing announcements."[7] I refer to these as the "Receivables and Retailer Issues" later in this opinion.

- Following this release, the market price for Meadowcraft's stock plummeted from the $9.125 a share range to $6.25 a share.

- In early March, Meadowcraft's president, William McCanna, approached NationsBank about financing a leveraged buyout ("LBO") of Meadowcraft. McCanna received analyses from NationsBank indicating that a $10 per share LBO could be financed without new equity.

- After Blount learned of McCanna's LBO inquiry, Blount essentially terminated McCanna. In his resignation letter, McCanna proposed that Meadowcraft buy out his shares at $10 apiece. Blount agreed to try to accomplish that.

- In advance of Meadowcraft's third fiscal quarter, which is one of its best due to the seasonal nature of demand for Meadowcraft's outdoor furniture products, Blount decided to buy out the 27% of Meadowcraft shares he did not own.

- To that end, on April 9, 1999, Blount announced his intention to offer $8 apiece for the public shares. To finance the offer, Blount intended to use the same NationsBank financing

---

6. Second Am. Compl. ¶ 16, at 8.

7. Second Am. Compl. ¶ 26.

McCanna had arranged. Andra contends that the buyout offer was in substantial part an excuse for Blount to cover his need to cash out the outgoing president, McCanna.

- A special committee of Meadowcraft directors was formed to consider Blount's offer. One of the members, defendant James M. Scott, was a lawyer whose law firm lists a business affiliated with Blount as a "representative client." Another member, defendant T. Morris Hackney, receives over $140,000 a year as his share of lease payments from Meadowcraft for Meadowcraft's use of a manufacturing facility owned by another company in which Hackney is a major stockholder. Thus the independence of two of the three special committee members is, at the very least, doubtful.

- Blount announced that he would not sell his Meadowcraft shares. Thus the special committee had no real ability to develop interest in another value-maximizing transaction because all it could market was a minority stake in Meadowcraft. With Blount's 73% block, it was unlikely that alternative buyers would emerge.

- In mid-May 1999, the special committee ultimately got Blount to pay $10 a share and agreed to support a back-end merger at that price. The special committee did not demand a majority of the minority voting provision.

- The $10 a share price was $3 below the IPO price and $6 below the Masco offer. Moreover, though Wachovia issued a fairness opinion supporting the $10 price, the same personnel at that investment bank had performed the January 1999 Wachovia Analyses just four months before suggesting that $10 was below the low end of a fair range of value for Meadowcraft stock.

- In the May 19, 1999 tender offer disclosure documents, no mention was made of the January 1999 Wachovia Analyses nor was it disclosed that Blount had forced out McCanna over the LBO issue and had agreed to help secure a purchase of McCanna's shares at $10 a piece.

### III. *Legal Analysis*

■ In addressing the defendants' motion to dismiss, I must accept the allegations of the complaint as true and accord Andra the benefit of all reasonable inferences that can be drawn from the complaint.[8]

The defendants' motion addresses two claims: (1) the claim that the tender offer disclosures were incomplete and materially misleading; and (2) the claim that the tender offer/back-end merger was substantively unfair and resulted from breaches of the defendant-directors' duties of loyalty and care. For somewhat different reasons, the defendants argue that Andra cannot press either claim. I address these arguments in turn.

### A. *Does Andra Have Standing To Press Her Disclosure Claims?*

■ With regard to the narrow issue of whether Andra may press her disclosure claims, the relevant facts are few:

- Before the tender offer, Blount owned 73% of the shares of Meadowcraft. As a result, the tender offer in no way enabled him to acquire the voting power necessary to effect, with Meadowcraft board approval, a squeeze-out merger. Blount already possessed such power.

---

8. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988).

- Andra's second amended complaint challenges the adequacy of the disclosures in connection with the tender offer, arguing that the inadequacies deprived Meadowcraft stockholders of the "ability to make an informed choice between tendering and seeking appraisal in the follow-up merger. The omission of the information described [in the second amended complaint] has deprived shareholders of essential information about the merits of seeking appraisal and the likelihood that such a proceeding would result in a materially higher per share payment for the shares."[9]

- The omissions primarily complained of were the lack of discussion of the January 1999 Wachovia Analyses and of the reasons for and complete terms of the McCanna resignation.

- The court afforded Andra an opportunity to litigate her preliminary injunction motion within a time frame that would have enabled the Meadowcraft stockholders to receive corrective disclosures before having to choose whether to tender.

- Andra eschewed that opportunity, based on her belief that a damages award identical to an appraisal remedy would be adequate.

- Andra did not tender into the tender offer, but instead preserved her appraisal rights.

Based on these facts, the defendants contend, and I agree, that Andra has no standing to challenge the disclosures issued in connection with the tender offer. Neither her second amended complaint nor her briefs on this motion explain how those disclosures could have possibly injured Andra. The theory of her complaint in this action is that the inadequate disclosures worked injury because they induced stockholders to tender rather than to seek appraisal. But Andra herself sought appraisal and did not suffer injury of this nature.[10]

In *Abajian v. Kennedy*,[11] Chancellor Allen dealt with an analogous situation. In

---

**9.** Second Am. Compl. ¶ 46; *see also id.* ¶ 43.

**10.** At oral argument, Andra's attorneys belatedly argued that she was injured because the insufficient disclosures resulted in an inadequate number of appraisal-eligible stockholders and thus made the prosecution of an appraisal action by Andra and her attorneys economically impractical. I understand the logic of this theory. *See* § III.B. of this opinion, *infra*. But I am not persuaded that our law should recognize as cognizable damage a plaintiff's claim that *others were misled* and therefore did not join her (who was not misled) as potential co-petitioners in an appraisal action. Acceptance of such a theory would force the court to entertain extremely attenuated claims premised on speculation about what percentage of stockholders might not have tendered if adequate disclosures had been made. When the named plaintiff claims that she was actually misled by disclosures herself, Delaware Courts must engage in this exercise in speculation, which involves an "inherent risk of error ... [of] counter-factual determinations ...." *Steiner v. Sizzler Restaurants Int'l, Inc.*, Del. Ch., C.A. No. 11994, mem. op., 1991 WL 40872, at *3, Allen, C. (1991). Andra cites no precedent in favor of also engaging in such speculation at the behest of stockholders who were not themselves misled by the defendants' conduct, and no compelling justification for this problematic extension comes to mind. In this respect, Andra had the opportunity to avoid this "harm" by pressing her preliminary injunction motion. Therefore, her request to gin up injury based on assumptions that a sufficient number of Meadowcraft stockholders would have otherwise not tendered to make an appraisal action economically viable is less than compelling. Moreover, 3% of the Meadowcraft shares were not tendered—enough shares that one cannot conclude that an appraisal action was not feasible.

**11.** Del.Ch., C.A. No. 11425, mem. op., 1992 WL 8794, Allen, C. (1992).

that case, a non-tendering stockholder alleged that the disclosures made in connection with a series of related transactions, which included a " 'Dutch auction' self-tender offer," were inadequate. Chancellor Allen declined to address a motion to dismiss those claims for failure to state a claim for the following reason:

> I do so because I am inclined to accept defendants' position as correct, that if plaintiffs did not sell any shares in the self-tender, they have no standing to complain about any defects that may appear in the Offer to Purchase. The facts allege[d] do not support an inference that non-tendering shareholders were injured by any defects that arguably may be contained in the Offer to Purchase. This is not a case in which a tender offer is used to put one in a position thereafter to force a cash out merger on non-tendering shareholders. In such a case a non-tendering shareholder may be dramatically if indirectly affected by deception in the tender offer document. *See Freedman v. Restaurant Associates Industries, Inc.,* Del. Ch., C.A. No. 9212, 1990 WL 135923 (1990).[12]

This reasoning is sound and is consistent with the proposition that persons should only be permitted to litigate claims that involve actual or threatened injury to themselves.[13]

Nor do I see any public policy purpose that would be served by allowing a plaintiff like Andra to assert claims that could not have possibly injured her personally. By denying Andra standing at this stage of the litigation, I by no means set a precedent that denies stockholders the opportunity to press disclosure claims in a timely and effective manner. Given our law's traditional deference to free and informed stockholder votes and investment decisions, it obviously makes sense to enable plaintiffs to press disclosure claims in advance of the time stockholders must choose. Such timely actions provide the opportunity for corrective disclosures that permit the stockholders—who are making the decision—to decide the issue in a fair manner, thereby respecting the primacy their views should have and reducing the need for courts to shape necessarily imprecise and somewhat speculative post-decision remedies for inadequate disclosures.

Indeed, the value conferred by plaintiffs who attempt to secure adequate disclosures in advance of a stockholder decision may well justify some relaxation of traditional standing requirements.[14] For exam-

---

12. *Abajian,* 1992 WL 8794, at *8.

13. *See, e.g., Guy v. Sills,* Del.Ch., C.A. No. 16201, let. op. at 3, 1998 WL 409346, at *1, Chandler, C. (1998) (To obtain standing, "a plaintiff must assert facts that he has been injured in a way that is unique to him in his individual capacity[.]").

14. In the recent case of *In re Marriott Hotel Properties II Limited Partnership Unitholders Litig.,* Del.Ch., C.A. No. 14961, mem. op., 2000 WL 128875, Lamb, V.C. (Jan. 24, 2000), Vice Chancellor Lamb applied such an approach to a plaintiff who alleged that disclosures were inadequate in advance of the tender decision, who was aware before the tender decision of "all or nearly all of the non-disclosures or misrepresentations about which he now complains after making that decision" and who alleged that the transaction was unfair before the tender decision, but who nonetheless tendered anyway. *Id.,* mem. op. at 47, 2000 WL 128875, at *21. But because the disclosures had moved to correct the disclosures through a preliminary injunction application *before* the tender decision, there were "valid jurisprudential reasons to permit [him] to continue acting as class plaintiff" notwithstanding these facts. *Id.* "To rule otherwise would discourage plaintiffs and their counsel from acting promptly to litigate disclosure claims in advance of the conclusion of a transaction. This is directly at odds with the interests of the class who are best served when full and complete disclosures are made in a timely

ple, had Andra actually pressed her preliminary injunction motion, perhaps it would be good policy to let her continue to litigate her disclosure-based claims, even though she decided not to tender.[15]

Andra, however, stands in a far different position. She had the opportunity to serve her fellow stockholders in that manner, but turned her back on it. Allowing her at this stage to press claims that do not involve injury to her would invite gamesmanship.

That is, to accord Andra standing would encourage named plaintiffs to file disclosure claims in connection with appraisal-eligible transactions, sit on those claims until after the other stockholders have made their decision, perfect their own appraisal claims and thus preserve their own personal options, and then simultaneously pursue appraisal and a class action for damages. This incentive system strikes me as perverse, in that it encourages named plaintiffs not to litigate disclosure claims at the time when such claims can still be used to promote a genuinely free stockholder choice—before the vote.

Permitting non-tendering stockholders to pursue such actions also exacerbates the always-extant risk that representative litigation is being pursued more for the benefit of the lawyers in the case than of the class whose interests are supposedly being advanced. This risk seems substantial when a tactical decision is made to eschew the opportunity to give the class members the information they need to make an informed judgment for themselves whether to tender or seek appraisal (through a timely injunction action) for the stated reason that the class representative and her lawyers can (they assert) secure a remedy for any harm suffered by the class through a damages suit (that the members of the class may or may not be interested in pursuing).

Andra notes and I acknowledge that this court has sometimes taken the position that there was no need to deal with disclosures in advance of a transaction because later money damages would suffice.[16] Yet more of this court's cases have emphasized that disclosure issues are best dealt with in a timely manner enabling informed stockholder choice.[17] Andra herself cited sever-

---

fashion." *Id.*, mem. op. at 47–48, 2000 WL 128875, at *21.

**15.** Given that Andra believed that tendering was foolish in view of information she knew about that was not disclosed to other stockholders, a decision by her to tender could have raised its own standing issues. But public policy considerations might favor allowing a stockholder who actually attempts to litigate disclosure claims at the preliminary injunction stage to continue with these claims regardless of her voting or tendering choice. *See Marriott*, mem. op. at 47–48, 2000 WL 128875, at *21 (resolving a similar situation in favor of plaintiff primarily on the policy ground that pre-vote litigation of disclosure claims serves an important interest).

**16.** *E.g.*, *Cottle v. Carr*, Del.Ch., C.A. No. 17727, mem. op., 1988 WL 10415, at *5, Allen, C. (1988) (finding applicable the principle that "money damages may provide an

adequate remedy where a tender offer appears to be defective in terms of disclosure").

**17.** *E.g.*, *State Wisconsin Investment Board v. Bartlett*, Del.Ch., C.A. No. 9612, order at 6, 2000 WL 193115, at *2, Steele, V.C. (2000) (ORDER) (stating that "[i]t is important that this Court protect the corporate franchise of Delaware shareholders[,]" that the shareholder franchise "can never be more important than when they are asked to vote upon a board approved and recommended merger[,]" and that *the shareholder vote must therefore* "be enjoined and postponed for fifteen days or until such later time as the parties may agree in order to assure that shareholders have had adequate time to assimilate information necessary to assure that they may cast an informed vote"); *Sonet v. Plum Creek Timber Co.*, Del. Ch., C.A. No. 16931, mem. op., 1999 WL 160174, at *11, Jacobs, V.C. (1999) (stating that "because the only source of the facts

al cases along these lines in obtaining expedited treatment of this case.[18]  By scheduling the preliminary injunction, I clearly gave Andra a fair chance to secure relief requiring full disclosure as a condition to the procession of Blount's tender offer. She, therefore, cannot attribute her decision to a belief that predecisional injunctive relief was unavailable.

I thus grant the defendants' motion to dismiss Andra's disclosure claims for lack of standing.

**B.  *Can Andra Press An Unfair Dealing Claim Against The Merger When She Concedes That The Appraisal Remedy Is Sufficient To Remedy Any Harm She Has Suffered?***

In her second amended complaint, Andra alleges facts that state a claim that the tender offer/back-end merger was subject to the entire fairness standard of review and that the price offered by Blount was in fact unfair. In essence, Andra contends that Blount took advantage of his 73% position to squeeze out the minority

stockholders at an unfair price, and used short-term adverse developments as a lever to extract the real, long-term value of Meadowcraft for himself at an inequitably advantageous price. No adequate procedural protections were afforded to the minority, because the Meadowcraft special committee had no bargaining leverage and could not feasibly seek out other transactions, was comprised of a majority of directors with an arguable interest in securing Blount's continued favor, did not exercise its authority to say no to a merger with Blount, and failed to demand the same "majority of the minority" protection from Blount that they had wanted from Masco. As a result of Blount's oppression and the other directors' allegedly supine reaction, Andra claims Blount was able to buy out the minority at a price that was well below the fair market value of Meadowcraft as identified by the special committee's own investment banker just five months before and that was $3 below the November 1997 IPO price.

---

that will inform [the Unitholders' vote on proposed conversion of a limited partnership into a real estate investment trust] are conflicted fiduciaries ..., only a most stringent disclosure standard, enforced by careful judicial scrutiny, can assure that the Unitholders' right to vote will have meaning" and therefore that where "the disclosures fell short of that standard ..., the Unitholders are entitled to injunctive relief that will cure the informational gap"); *Matador Capital v. BRC Holdings*, Del.Ch., 729 A.2d 280, 298 (1998) (granting preliminary injunction requiring corrective disclosure and extension of tender offer); *Marriott*, mem. op. at 47–48, 2000 WL 128875, at *21.

18.  *See* Aff. in Support of Pl.'s Motion to Expedite ¶ 6 ("Where, as here, there are material deficiencies in the disclosure documents recommending shareholder action, this Court has held that injunctive relief is the appropriate remedy.  *See, e.g., Gilmartin v. Adobe Resources Corp.*, Del.Ch., C.A. No. 12467, 1992

WL 71510, Jacobs, V.C., [mem.] op. at 29 (1992) ('[t]he right to cast an informed vote is specific, and its proper vindication in this case requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages'); *Eisenberg v. Chicago Milwaukee Corp.*, Del.Ch., 537 A.2d 1051, 1062 (1987) (shareholder's right to make informed, uncoerced decision requires specific, not substitutional remedy for which damages would be neither meaningful nor adequate); *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, Del.Ch., 532 A.2d 1324, 1342 (1987) (holding that an injunction is the remedy most likely to obtain disclosure of the information necessary to achieve an informed decision and eliminate the offer's coercive aspects); *Joseph v. Shell Oil Co.*, Del.Ch., 482 A.2d 335 (1984) (holding that permitting minority stockholders to tender shares without curing defendants' omissions would forever deny tendering stockholders their rights to be treated fairly, and would constitute irreparable harm).").

Given that I must draw all reasonable inferences in Andra's favor, I cannot dismiss her complaint for failure to state a claim. Nonetheless, the defendants contend that the complaint should be dismissed on the alternative basis that Andra should be relegated to the appraisal remedy.

■ Ordinarily, one would reject the defendants' assertion out of hand. In the wake of *Rabkin v. Philip A. Hunt Chemical Corp.*[19] and *Cede II,*[20] it has become nearly impossible for a judge of this court to dismiss a well-pled unfair dealing claim on the basis that appraisal is available as a remedy and is fully adequate. Although the Supreme Court has never held that this court cannot limit a plaintiff to an appraisal remedy if that remedy is fully adequate, its prior holdings are reasonably read as indicating that so long as a plaintiff can state a claim for breach of fiduciary duty in connection with the merger, he can press an unfair dealing claim.[21] The unavailability of a class action and fee shifting in appraisal actions makes an unfair dealing action more attractive from the perspective of plaintiffs, thus leading to the litigation of lawsuits that require a determination of the fairness of the process used and the price paid when appraisal lawsuits addressing solely the issue of fair price would otherwise be sufficient.[22]

The present case tests the limits of *Rabkin* and *Cede II.* I understand those cases as in large part resting on the rationale that a determination of fair value in an appraisal action may not always be sufficient to address the harm caused by

19. 498 A.2d at 1104.

20. 634 A.2d at 367.

21. *Wood v. Frank E. Best, Inc.,* Del.Ch., C.A. No. 16281, mem. op. at 13, 1999 WL 504779, at *5, Chandler, V.C. (1999) ("For good or ill, however, as *Cede* makes clear, a colorable allegation of breach of entire fairness is sufficient to proceed with an equitable entire fairness action, despite the availability of appraisal as an alternative remedy."); *see* Jack B. Jacobs, *Reappraising Appraisal: Some Judicial Reflections,* Speech at 15th Annual Ray Garrett, Jr. Corporate and Securities Law Institute, Northwestern University School of Law, at 12 (Apr. 27, 1995) (hereinafter, *"Reappraising Appraisal"*) ("*Rabkin* held that if there was any procedural unfairness in connection with a merger, even if the only result was an unfair price, appraisal would not be adequate to remedy the wrong, and therefore, would not be exclusive. To minority stockholders, *Rabkin* offered an easy way to circumvent appraisal—by simply filing a stockholders fiduciary duty action that alleged unfair dealing.").

22. Vice Chancellor Jacobs has succinctly captured the essential differences between a statutory appraisal action and an equitable fiduciary action:

Appraisal is purely a creature of statute. Its underlying concept is that a stockholder dissenting from a merger or other triggering transaction is entitled, without having to prove wrongdoing or liability on anyone's part, to a determination of the fair value of his investment by an independent agency, usually a court. The only party held liable is the surviving corporation, and the measure of recovery is the fair or intrinsic value of the corporation's stock immediately before the merger. Post-merger synergies or values are not to be considered. In most states, including Delaware, the right to court-awarded attorneys fees in an appraisal is highly limited.

In contrast, a stockholders' class action for breach of fiduciary duty is a creature of equity. To obtain a monetary recovery, the plaintiff shareholder must prove wrongdoing and establish liability. The parties from whom the recovery is sought are normally the corporation's directors and executive officers. The measure of the recovery is not limited to the statutorily appraised value, and in some cases, may include post-merger values computed as rescissory damages. Because the proceeding is equitable in nature, a court-awarded fee, payable by the corporation or from any fund created by a successful plaintiff, is available. *Reappraising Appraisal,* at 3.

breaches of fiduciary duty in the context of mergers.[23] Because an entire fairness action permits this court the flexibility to shape a remedy fitting to the breach (e.g., rescissory damages when justified), a plaintiff who can state a claim for breach of fiduciary duty ordinarily should not be relegated to the (implicitly less adequate) remedy of appraisal, where the only remedy is the fair value of plaintiff's stock. Otherwise, there is a risk that victims of fiduciary breaches will be less than wholly compensated for the harm done them, thus creating less than an adequate incentive for fiduciaries to comply with their "unremitting" duties of loyalty and care.[24]

Here, however, Andra expressly concedes that damages "equivalent to the appraised value of [her] stock" are a "complete" remedy "for the wrongs complained of in this action."[25] In fact, the fiduciary breaches that Andra alleges all ultimately relate to issues of fair value. For example, Andra claims that the Receivables and Retailer Issues were merely short-term setbacks that did not adversely affect the long-term value of Meadowcraft. According to Andra, Blount used these short-term problems as a pretext to extract the long-term value of Meadowcraft for himself at an unfair price. Quite obviously, the question of whether the Receivables and Retailer Issues were one-time problems or more sustained problems affecting the long-term, intrinsic value of the company is one that will be central in an appraisal proceeding.

Indeed, even Andra's key disclosure issue centers on a valuation issue. Andra asserts that the January 1999 Wachovia Analyses should have been disclosed. The defendants contend that those Analyses were immaterial because they were based on information that was no longer relevant as of May 1999, in major part because the Receivables and Retailer Issues had changed the underlying earnings potential of Meadowcraft in a fundamental and enduring way.

This case is not therefore one in which an award of fair value in appraisal terms will be inadequate to make Andra whole for her core claim.[26] This contrasts with the obvious situation where an appraisal would not be an adequate remedy. Posit a scenario where a 43% stockholder who is the company's chairman and chief executive officer consummates a tender offer followed by a back-end, squeeze-out merger. Suppose the stockholder offered $25 a share, which is by any measure "fair," and obtains tenders from enough minority stockholders to enable him to cash out the remaining minority stockholders in a short-form merger at the same price. Undisclosed by the 43% stockholder, however, is the fact that a well-funded third party was willing to make a tender offer for $28 a share but had been rebuffed by the 43% stockholder, who did not even disclose the offer to the rest of his hand-picked board. In such a scenario, an appraisal remedy would not be sufficient to remedy the monetary harm that might have been suffered by the stockholders as a result of any breach of fiduciary duty they might prove had been committed by the 43% stockholder. While $25 is a fair price, they had arguably been wrongfully denied the opportunity for $28. That is not this case.

---

**23.** *Rabkin,* 498 A.2d at 1104–08; *Cede II,* 634 A.2d at 367.

**24.** *Quickturn Design Systems, Inc. v. Shapiro,* Del.Supr., 721 A.2d 1281, 1292 (1998).

**25.** Pl. Letter to the Court, at 1 (June 7, 1999).

**26.** Moreover, because Blount now owns all of Meadowcraft, an award against that company essentially comes out of the pocket of the (allegedly) primary wrongdoer.

In this case, the only apparent inadequacies of the appraisal remedy are that Andra does not get to represent a class and thus neither do her attorneys and that the appraisal action will not involve a determination that there was a fiduciary breach and the concomitant possibility for an award of attorneys' fees against the defendants. The availability of a class action is probably the more important and its primary utility (like the possibility of fee-shifting) also relates to the subject of litigation costs.[27] In a class action, the plaintiff's lawyers can take their fees and expenses against any class-wide recovery, whereas in an appraisal action the fees and expenses can be recovered only as an offset against the appraisal award to the usually far smaller group of stockholders who perfected their appraisal rights. It is much less attractive, for example, to act as an attorney for fifty-seven appraisal stockholders who own small blocks than as counsel for a class comprised of all, or at least most, of the company's stockholders. Hereinafter, I sometimes refer to both these advantages of an unfair dealing action as the "Litigation–Cost Benefits."[28]

Thus this case requires a policy choice between two models placing a primary emphasis on different values. Under one model, a plaintiff should be limited to appraisal if an appraisal award would be sufficient to redress the direct harm flowing from the fiduciary breach, regardless of whether it denies the plaintiff the Litigation–Cost Benefits of an unfair dealing claim. This model would stress the primacy of appraisal (when that statutory remedy is available) and the efficiency of avoiding unnecessary determinations regarding fair process when a single inquiry into price will suffice.

The other model would stress the need to provide a full and adequate remedy for fiduciary breaches and would take into account the real-world significance of procedure and litigation costs in that regard. To the extent that fiduciaries believe that they can avoid responsibility to the entire class of their stockholders and require a relatively small group of appraisal petitioners to bear (out of any recovery) the substantial costs of an action to prove an unfair price, fiduciaries may not be adequately deterred from engaging in faithless behavior. This model would also recognize that a plaintiff who has an appraisal remedy minus the costs of litigation is in fact worse off than a plaintiff without an appraisal remedy who can obtain an a class-wide award of quasi-appraisal damages plus the possibility of an award of attorneys' fees paid by the defendants.

In considering which model is most in keeping with the Supreme Court's teachings in this area, candor requires an acknowledgement that it is the Litigation–Cost Benefits of a class action that most often makes an unfair dealing claim so much more attractive than appraisal from a plaintiff's perspective, not the theoretical possibility of an award of (rarely granted) rescissory damages. Class actions and fee shifting are crucial if litigation is to serve as a method of holding corporate fiduciaries accountable to stockholders. Without them, collective actions problems would make it economically impractical for many

---

27. Randall S. Thomas, *Revising the Delaware Appraisal Statute*, 3 DEL. L. REV. 1, 27–28 (2000) ("Although the named petitioner can spread its costs of prosecuting an appraisal action over the entire group of shareholders seeking appraisal, and thereby pay only a portion of the total costs of the action, a small shareholder will only find an appraisal petition cost-justified where many thousands of shares are also seeking this remedy.").

28. As I use it here, the term obviously refers solely to the cost benefits from the perspective of a plaintiff or plaintiff's lawyer.

meritorious actions to be brought.[29] Indeed, one wonders whether Andra could have found counsel to bring this lawsuit on a non-class action basis.

Choosing one of these models essentially boils down to a policy decision best made by a legislature, not a court. But the dilemma arises in this context not out of an ambiguity in the language of the Delaware General Corporation Law ("DGCL"),[30] but out of the understandable difficulty our courts have had in distinguishing between those situations in which a plaintiff should be limited to an appraisal remedy and those in which a plaintiff may also pursue an equitable action for breach of fiduciary duty.

This case presents that policy choice nicely. After all, if the unavailability of a class action and an attorneys' fee award renders appraisal an inadequate remedy for a plaintiff such as Andra who concedes that a fair value award is otherwise sufficient, that would create a clear *per se* rule that every well-pleaded claim that a merger is unfair as a result of fiduciary breaches may proceed on an equitable, non-statutory basis, alongside any appraisal action.[31] Put another way, if Andra may press an unfair dealing claim in this context, then any plaintiff with appraisal rights may also.[32]

Although the Supreme Court has never explicitly addressed the issue in this stark manner, *Rabkin* and *Cede* place a higher value on the full remediation of fiduciary breaches than they do on channeling claims into the more streamlined and confined appraisal remedy process—even when that process can make a plaintiff whole as to its claim (putting litigation costs to the side).[33] *Rabkin*, for example, stresses the need for a full remedy of the harm caused by "faithless acts" and "procedural unfairness" and emphasizes the anomaly that "stockholders who are eliminated without appraisal rights can bring class actions, while in other cases a squeezed-out minority is limited to an ap-

**29.** *Reappraising Appraisal,* at 11 ("The post-*Weinberger* [*v. UOP, Inc.,* Del.Supr. 457 A.2d 701 (1983),] experience shows that for dissenting shareholders with relatively small investments and unable independently to afford competent counsel the improved appraisal remedy remains ineffective. That is because *Weinberger* could not eliminate appraisal's structural problems, or the relative superiority of the damage class action, which offered reasonable attorneys' fees and the prospect of rescissory damages.")

**30.** Nothing in 8 *Del. C.* § 262 expressly states that appraisal is an exclusive remedy. In this case, moreover, there is no tension between an unfair dealing action and other parts of the DGCL. Because Blount only gained his ability to consummate a § 253 short-form merger through an essentially unitary tender offer/back-end merger transaction, no contention can be made that permitting an unfair dealing action to proceed against him is inconsistent with the efficient, relatively process-free merger method § 253 contemplates. In a situation, by contrast, where a majority stockholder already holds sufficient shares to conduct a short-form merger *before* any of the conduct which the plaintiff attacks occurred, allowing an unfair dealing attack on the merger might well conflict with § 253 because it would require (through the burden-shifting rules applicable under our law's business judgment rule and entire fairness standards) the majority stockholder to set up a special committee or to make the merger contingent on the support of a majority vote of the minority stockholders in order to avoid the burden of proving "entire fairness." *See Kahn v. Lynch Communications Systems, Co.,* Del.Supr., 638 A.2d 1110, 1117 (1994).

**31.** Subject to the caveat mentioned in note 30 for a "pure" short-form merger under 8 *Del. C.* § 253.

**32.** Again, with the probable exception adverted to in notes 30 and 31.

**33.** *See Wood,* mem. op. at 13, 1999 WL 504779, at *5.

praisal."[34] In this same vein, why should a plaintiff with appraisal rights be denied access to the Litigation–Cost Benefits of an unfair dealing action when a plaintiff without appraisal rights has access to those Benefits? And a forest-level reading of two of the Supreme Court's opinions in (the still-ongoing) *Cede* case shows the substantially greater weight the Supreme Court has given to a full remedy of fiduciary breaches than to considerations of judicial economy or litigation efficiency.[35]

The substantial procedural advantages of equitable actions has naturally led to a strong preference for such actions over the otherwise seemingly attractive (from a plaintiff's perspective) prospect of appraisal actions focused solely on a fair value remedy. Until legislative action is taken to make it more economically feasible for attorneys who represent plaintiffs with small shareholdings to prosecute an appraisal action, such attorneys (and their clients) will continue to prefer, as a general matter, equitable actions over appraisal

actions.[36] And because I can discern no reasoned basis, per *Rabkin* and *Cede*, to deny Andra access to a potential attorneys' fee award or a class-based sharing of litigation costs when a similarly situated plaintiff without appraisal rights would have such access, I conclude that she may proceed with her unfair dealing claim.

An important caveat is in order, however. When Andra presents her class certification motion, which she is duty-bound to do promptly, I will give careful consideration as to whether Andra can represent a class including tendering stockholders. Because Andra has no standing to litigate the disclosure claims, it might be necessary to limit her to representing the non-tendering stockholders who are situated similarly to her. Absent an effective challenge to the disclosures in connection with the tender offer, tendering stockholders may well be subject to the defense that they are estopped from challenging the fairness of a transaction whose benefits they willingly accepted.[37]

---

**34.** 498 A.2d at 1107–08.

**35.** *See Cede & Co. v. Technicolor, Inc. ("Cede I"),* Del.Supr., 542 A.2d 1182 (1988); *Cede II,* 634 A.2d at 367.

**36.** An incisive article by Professor Randall S. Thomas advances several provocative ideas about how to reform the appraisal statute and better balance the competing policy interests at stake. *See* Randall S. Thomas, *Revising the Delaware Appraisal Statute,* 3 DEL. L. REV. 1, *passim; see also Reappraising Appraisal,* at 17 (advancing several possible reforms as a basis for legislative consideration).

As Professor Thomas's article suggests, however, such reform requires the type of comprehensive restructuring and authorial freedom legitimately exercisable only by the legislative branch of our government, with advice from the Delaware State Bar Association's Corporate Law Council. Given the complexity of the problems and the zero-sum nature of some of the necessary trade-offs, no one should be surprised if, in the absence of legislative action more clearly specifying the

relative weight to be given to (seemingly rival) values such as litigative efficiency, transactional predictability, and fairness to minority stockholders, judge-made case law is not capable of sensibly and reliably balancing those values.

**37.** *Bershad v. Curtiss–Wright Corp.* Del.Supr., 535 A.2d 840, 848 (1987) (a party who voluntarily accepts the benefits of a transaction with knowledge of all material facts may not later challenge that transaction).

In noting this issue, I am by no means unaware of the effect such a decision could have on the feasibility of this action from the standpoint of Andra's counsel and the apparent logical inconsistency that lack of feasibility might create in view of my reasoning. If this feasibility problem arises, however, it will result from Andra's own tactical decision to drop her preliminary injunction motion and will be a case-specific problem that does not undermine the more generally applicable reasoning that undergirds my decision that plaintiffs like Andra may press unfair dealing

## IV. *Conclusion*

For the foregoing reasons, I grant the defendants' motion to dismiss Andra's disclosure claims and deny the defendants' motion to dismiss her unfair dealing claim. IT IS SO ORDERED.

claims. When the class certification motion is presented, these issues can be examined in greater depth, if necessary, with the fuller input of the parties.