MENTOR GRAPHICS CORPORATION, an Oregon corporation, and MGZ Corp., a Delaware corporation, Plaintiffs,

v.

QUICKTURN DESIGN SYSTEMS, INC., a Delaware corporation, et. al., Defendants.

Mentor Graphics Corporation, an Oregon corporation, and MGZ Corp., a Delaware corporation, Plaintiffs,

v.

Keith R. Lobo, et. al., Defendants.

Nos. C.A. 16584–NC, C.A. 16843–NC.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 2, 2001.
Decided: Aug. 14, 2001.
Revised: Aug. 16, 2001.

*OPINION*

A hostile bidder for control of a corporation brings a lawsuit that successfully invalidates one of the target corporation's anti-takeover defenses. In the competitive auction that results, the hostile bidder loses to an acquirer that makes a higher bid. The unsuccessful bidder then applies (in its successful lawsuit) for an award of attorneys' fees, claiming that by dismantling the anti-takeover defense, it benefited the target corporation's shareholders, and thereby obligated those shareholders and/or the target corporation to pay its legal expenses.[1] The critical issue on this motion is whether the unsuccessful bidder is entitled to recover its attorneys' fees on that ground. The answer, for the reasons next set forth, is no.

## I. RELEVANT FACTS

The hostile bidder-attorneys' fee applicants are Mentor Graphics Corporation and its wholly owned subsidiary, MGZ Corporation (collectively, "Mentor"). In 1997, Mentor began to consider acquiring Quickturn Design Systems, Inc. ("Quickturn"), the target company, which was a competitor in the electronic design automation ("EDA") business. Mentor's financial advisor advised Mentor that although an acquisition of Quickturn would provide substantial value for it, Mentor could not afford to acquire Quickturn at the then-prevailing market levels. That is, Quickturn was too expensive at that point in time. But after Quickturn's stock price began to decline in May, 1998, Dr. Walden Rhines, Mentor's Chairman, was told that the weak market for EDA products due to the Asian crisis gave Mentor a good opportunity to acquire Quickturn "for a cheap price."[2]

---

1. The fee applications are pending in two actions brought by Mentor Graphics Corporation in 1998 when it was seeking to acquire Quickturn Design Systems, Inc.: *Mentor Graphics Corporation v. Quickturn Design Systems, Inc.*, Del.Ch., C.A. No. 16584 (filed August 12, 1998) (*"Mentor I"*), and *Mentor Graphics Corporation v. Lobo, et. al*, Del.Ch., C.A. No. 16843 (filed Dec. 15, 1998) (*"Mentor II"*). *Mentor I* was resolved by a decision of the Delaware Supreme Court on December 31, 1998 (*Quickturn Design Systems, Inc. v.*

*Shapiro*, Del.Supr., 721 A.2d 1281 (1998)), and *Mentor II* has been dormant since January 7, 1999, when Mentor withdrew its offer to acquire Quickturn. The fee applications were not filed until July 14, 2000.

2. *Mentor Graphics v. Quickturn Design Systems,* Del.Ch., 728 A.2d 25 (1998) at 31–32; *aff'd sub nom, Quickturn Design Systems v. Shapiro*, Del.Supr., 721 A.2d 1281, 1285 (1998) (*"Mentor I"*).

Accordingly, in the summer of 1998, Mentor began purchasing Quickturn shares on the open market, acquiring 591,-500 shares (3% of Quickturn's outstanding shares) between June 19 and August 10, 1998. On the following day, August 11, 1998, Mentor's Dr. Rhines scheduled a dinner with Quickturn's Chairman, Mr. Glen Antle. At dinner, Dr. Rhines handed Mr. Antle a letter which stated that Mentor would be launching a hostile tender offer the next day. Dr. Rhines did not tell Mr. Antle that Mentor had also prepared complaints in two lawsuits that Mentor intended to file the next morning. Those lawsuits would seek the removal of the Quickturn board, plus other relief aimed at dismantling any opposition to Mentor's hostile bid. Mr. Antle asked Dr. Rhines for more time to take the offer to his board, to enable the board to consider negotiating a friendly deal. Dr. Rhines refused, responding that it was "too late."

The next morning Mentor launched its hostile cash tender offer at $12.125 a share, which was 20% below Quickturn's February 1998 stock price. After its consummation, Mentor's tender offer would be followed by a second step merger in which Quickturn's nontendering stockholders would receive, in cash, the same $12.125 per share price. Mentor also notified Quickturn that it would seek to call a special shareholders' meeting—to be held 45 days after the call—for the purpose of removing the Quickturn board. Replacing Quickturn's board was an essential part of Mentor's strategy, because Quickturn had in place a "poison pill" shareholder rights plan that would prevent Mentor from acquiring Quickturn without the consent of the Quickturn board. The board's consent would not likely be forthcoming unless Mentor was prepared to offer a price that was too good to be turned down.

Although Mentor now asserts on its fee application that these actions "were aimed directly at maximizing shareholder value" and that its "interests were aligned fully with Quickturn's stockholders,"[3] this Court found as fact that "Mentor's offer and related actions were timed to strike at Quickturn while its stock price was at a temporary low...."[4]

In the face of Mentor's hostile takeover efforts, the Quickturn board made a two-pronged response. The first was to amend Quickturn's bylaws to adopt a provision under which any action pursuant to a special meeting called by stockholders could only take place between 90 and 100 days after the stockholders' request for the meeting (the "Advanced Notice By–Law"). The purpose of the Advanced Notice By–Law was to protect Quickturn's shareholders from being stampeded into a decision without adequate time to become informed, and also to permit Quickturn's board additional time to consider and seek other value-maximizing alternatives.

The board's second defensive response was to amend the Quickturn shareholder rights plan to add a "deferred redemption" provision (the "DRP"). Under the DRP, if a party proposed, nominated or financially supported the election of new directors to the board, that party's ("Interested Person's") sponsored nominees could not facilitate a transaction with the Interested Person for a period of six months. Thus, the effect of the DRP, standing alone, would be to delay any transaction with Mentor for six months. In combination with the Advanced Notice By–Law, the delay would be nine months.

Consistent with its objective of acquiring Quickturn while its stock price was low, Mentor amended the complaint in its first

---

**3.** Mentor Opening Brief in Support of Fee Application, at 42.

**4.** *Mentor I,* 728 A.2d at 46–47.

lawsuit (*Mentor I*) to challenge those newly-adopted defensive measures as breaches of the Quickturn directors' fiduciary duties. In addition, once Mentor had enough proxies to call a special meeting of the Quickturn stockholders, Mentor called that meeting for October 1, 1998.[5] Under the Advanced Notice By–Law, however, the Quickturn board had the authority to make all shareholder-requested meetings subject to the new 90 to 100 day window. The board exercised that authority, and scheduled the special stockholders meeting for January 8, 1999.

Those events dictated the timetable for the prosecution and resolution of *Mentor I*, the action in which Mentor challenged the validity of the Advanced Notice By–Law and the DRP. A five-day trial was held, beginning on October 9, 1998. On December 3, 1998, this Court issued its post-trial Opinion in *Mentor I*, upholding the Advanced Notice By–Law provision as a reasonable and proportionate response to the threat posed by Mentor's offer to Quickturn and its shareholders. The threat was that Quickturn's shareholders would choose to elect Mentor's slate of directors (and that Mentor's newly elected director-designees would decide to sell Quickturn to Mentor) without sufficient time to become adequately informed.[6] A result of this ruling was to keep in place the January 8, 1999 stockholders meeting date previously chosen by Quickturn's board.

This Court did, however, invalidate the DRP. It found that that takeover defense fell outside the range of reasonable responses, and was therefore disproportionate to the threat posed by Mentor's offer.[7] The Court also found that the DRP was not coercive or preclusive and that its mandated six-month delay to consummate any merger with Mentor would not effectively force Mentor to withdraw its offer. Thus, the elimination of the DRP would accelerate, but not otherwise fundamentally change, the dynamic of the process.

In addition to adopting takeover defenses, Quickturn explored alternative value-maximizing transactions. Beginning in August of 1998, Quickturn's Chief Executive Officer discreetly contacted several potential "white knight" acquirors in the industry, including Cadence Design Systems, Inc. ("Cadence"). The firms that were contacted expressed some interest in further discussions, but no proposal emerged. In November, Quickturn again contacted Cadence, and this time Cadence expressed further interest in exploring a transaction. On December 1, 1998, before this Court issued its Opinion in *Mentor I*, Cadence and Quickturn representatives met, and over the next several weeks they negotiated a merger agreement that was formally entered into on December 8, 1998. Under that merger agreement, Quickturn stockholders would receive Cadence stock worth $14 per share. The Cadence proposal was superior to Mentor's in that it

---

**5.** Mentor later renoticed the special meeting to November 24, 1998, anticipating that this Court would have decided the case by then. Because this Court's Opinion had not been released by that date, Mentor convened the meeting on November 24, 1998 but promptly adjourned it to a later date. *Mentor I*, 728 A.2d at 37, n. 45.

**6.** *Mentor I*, 728 A.2d at 36–37, 40–43. Mentor did not appeal from that ruling, which became final. 721 A.2d at 1289.

**7.** *Id.*, 728 A.2d at 49–52. On appeal from that ruling the Supreme Court affirmed, but on a different ground, namely, that the DRP impermissibly precluded the Quickturn board from performing its fiduciary duties by limiting the board's statutory powers conferred by 8 *Del. C.* § 141. *Quickturn Design Systems v. Shapiro*, 721 A.2d at 1292.

offered higher value ($14 per share vs. $12⅞) and would also enable Quickturn shareholders to participate in the future of a combined Cadence/Quickturn entity.

Rather than raise its bid, Mentor filed a second lawsuit ("*Mentor II*"), in which Mentor alleged that (i) by agreeing to a merger with Cadence, Quickturn's directors had violated their fiduciary duties, and (ii) that Cadence had aided and abetted those violations.[8] Mentor sought to have the Cadence transaction enjoined and for the Court to require the Quickturn shareholders' meeting then scheduled for January 8, 1999 to go forward without the competing Cadence proposal on the table. If successful, *Mentor II* would facilitate Mentor's ability to acquire Quickturn free of competition.

On December 16, 1998, Howard Shapiro filed a stockholders' class action on behalf of all Quickturn shareholders seeking similar relief ("*Shapiro II*").[9] In conjunction with that action, Shapiro's counsel sent a letter to counsel for Quickturn, contending that Quickturn was in "auction mode," and demanding that Quickturn commence a formal bidding process that would allow all bidders equal access to due diligence materials. On the same day, Shapiro's counsel also sent to Mentor's counsel a letter urging Mentor to make its highest and best offer.

Mentor, in contrast, never made any effort to promote an auction or to encourage Cadence to make its highest and best offer. Rather, Mentor's response was to make partial offers that ultimately were not competitive. On December 28, 1998, Mentor raised its offer to $14 per share, but only for 2.1 million shares (representing 12%) of Quickturn's outstanding stock. Mentor disclosed that it intended to effectuate a subsequent cash-out merger at the same price, and that it would increase its price by $.60 per share—if the break-up fees were invalidated.

On January 5, 1999, Quickturn and Cadence announced an increase in the Cadence merger consideration to $15 per share of Cadence stock. The following day, January 6, Mentor purported to match (but not top) that offer by increasing the "front end" price in its partial cash offer to $15 per share. Importantly, Mentor disclosed that it did not have financing for a "back-end" merger at the $15 per share price.

Perhaps because its partial $15 per share cash offer with an uncertain back-end could not compete in the marketplace, Mentor took the unusual step of seeking in both this Court and the United States District Court for the District of Delaware, a temporary restraining order preventing the very stockholders meeting that Mentor had called. Both motions were denied.

Thereafter, Mentor never increased its bid. Instead, after the District Court denied Mentor's application for a restraining order, and shortly before the special stockholders meeting scheduled later that day, Mentor formally withdrew its offer and its request for the special meeting. Thereafter, more than four months elapsed before Quickturn and Cadence could consummate their merger, yet at no time during that intervening period did Mentor increase its offer or prosecute its claim that the merger agreement was improper or unlawful.

---

**8.** The fiduciary violation claims charged the board with an alleged failure to "shop" Quickturn and agreement to pay improper termination fees.

**9.** *Shapiro v. Antle,* Del.Ch., C.A. No. 16850. Shapiro had also filed a class action lawsuit the day after Mentor filed *Mentor I,* raising similar claims. *Shapiro v. Antle,* Del.Ch. C.A. No. 16588 ("*Shapiro I*"). That action was resolved as part of this Court's December, 1998 Opinion in *Mentor I.*

That is, once Mentor lost its opportunity to acquire Quickturn at a price of its choosing, Mentor lost· interest in its litigation and in bidding for Quickturn.

After its approval by Quickturn's stockholders, the Quickturn–Cadence merger was consummated on May 25, 1999. Based upon Cadence's then-prevailing stock price, each Quickturn share was converted into the right to receive 1.2712 Cadence shares. Thereafter, the Asian markets recovered and the price of technology stocks, including Cadence's stock, increased significantly throughout 1999 and into early 2000. By January 20, 1999, Cadence's stock was trading between $22 and $24 per share, making the value of the Cadence stock received in the merger worth approximately $30 per share. Assuming Mentor still holds its Cadence shares, and based on Cadence's stock price of over $23 per share,[10] Mentor reaped a profit of over $12 million on its investment in Quickturn's stock.

On May 10, 1999, shortly before the stockholders meeting called to vote on the Cadence/Quickturn merger, Howard Shapiro filed another action against the defendants ("*Shapiro III* "),[11] seeking a temporary restraining order directing the defendants to place into escrow $2,044,300 of the merger consideration. The purpose was to preserve a fund from which an attorney's fee could be paid to class plaintiffs' counsel for their prosecution of *Shapiro I* and *Shapiro II*. The following day, class plaintiffs' counsel applied for an award of $2,044,300 in attorney's fees and expenses.

One week later, the parties to *Shapiro II* reached an agreement in principle (later memorialized in a written Memorandum of Understanding) to settle their claims in that action, and Shapiro withdrew his request for injunctive relief in *Shapiro III*. On April 20, 2000, the parties to the *Shapiro* actions filed a Stipulation of Settlement whereby in exchange for a release, Quickturn—now owned by Cadence—agreed to pay the counsel fees and expenses of the class up to $825,000, thereby leaving the full amount of the merger consideration available for distribution to class members. A condition of that Settlement, however, was that none of the defendants be required to pay any additional costs, counsel fees or expenses to any other party or class member, which would include Mentor.

In contrast to Shapiro, Mentor never made any request to Quickturn, Cadence or this Court to have a portion of the merger consideration set aside to fund a potential award of attorneys fees. Moreover, Mentor waited until July 14, 2000—fourteen months after the merger was consummated—to file its attorney's fees application.

## II. THE PARTIES' CONTENTIONS

Mentor's argument in support of its fee application is relatively straightforward, and runs as follows: Delaware law establishes three requirements for a stockholder-plaintiff to become entitled to a fee award: (1) the plaintiff's claim must be meritorious when filed, (2) a common fund or corporate benefit must inure to the corporation or its stockholders, and (3) a causal relationship must exist between the litigation and the common fund created or benefit conferred.[12]

---

10. As of September 12, 2000, the date that Cadence's Brief Opposing Mentor's Fee Application, was filed.

11. *Shapiro v. Cadence Design Systems, Inc.,* Del.Ch., C.A. No. 17146.

12. *United Vanguard Fund, Inc. v. TakeCare, Inc.,* Del.Supr., 693 A.2d 1076, 1079 (1997); *Tandycrafts, Inc. v. Initio Partners,* Del.Supr., 562 A.2d 1162, 1167 (1989).

Mentor claims that its two lawsuits, *Mentor I* and *Mentor II*,[13] satisfy all three of these requirements. First, the *Mentor I* complaint was meritorious when filed, because Mentor prevailed on its claim that the DRP was legally invalid and its claims against the Advance Notice By–Law were sufficient to survive a motion to dismiss. Second, the invalidation of the DRP created substantial non-monetary benefits [14] and also a common fund of over $33 million for the benefit of Quickturn's stockholders, based on the difference between the $12⅛ Mentor offer and the Cadence merger price. Third, a causal relationship existed between the *Mentor I* DRP litigation and the Cadence merger, because but for Mentor's victory in that litigation, Quickturn would not have agreed to the Cadence merger. Instead, it would have remained an independent public company.

Mentor varies these arguments slightly, to support its contention that it is also entitled to recover its legal expenses in *Mentor II.* Mentor argues that its *Mentor II* complaint stated claims against the Quickturn board for breaches of fiduciary duty. The claims were that the Quickturn board treated Cadence in a favored manner while "freezing out" Mentor, it entered into a merger agreement with Cadence that amounted to a coercive and preclusive defensive response, and it created unlawful impediments to competitive bidding that would otherwise yield the best value reasonably available. Mentor points, in particular, to a lock-up option that prevented any competitive bid from receiving pooling-of-interests treatment. Mentor fur-

ther contends that the result of *Mentor II* was to create an over $18 million common fund, measured by the $1 per share increase in the value of the Cadence merger consideration multiplied by the number of Quickturn's outstanding shares. Finally, Mentor contends that because the common fund resulted after its *Mentor II* complaint was filed, the requisite causal connection is presumed to exist, and the defendants have shown nothing to rebut that presumption.

The defendants do not dispute Mentor's argument that its two lawsuits satisfy the aforementioned three criteria. Rather, their response is that in all events, Mentor's fee application must fail on two separate and independent grounds. The first is that whatever entitlement a differently situated Quickturn shareholder might otherwise have to seek an attorneys' fee, Mentor has no such entitlement because Mentor was a losing hostile bidder for corporate control. As such, Mentor lacks standing under Delaware law to seek attorneys' fees from the corporation's shareholders. Defendants point to *In re Dunkin' Donuts Shareholders Litigation* ("*Dunkin' Donuts*") [15] as on-point Delaware authority for the principle that as a matter of policy, no exception to the American Rule (under which each litigant is responsible for its own counsel fees) [16] will be made for bidders for corporate control. The reasons are that the interests of such bidders are not aligned with the best interests of the public stockholders, and bidders need no financial incentive to bring litigation in support of their bid.

---

**13.** Mentor refers to *Mentor I* as the "DRP litigation," and to *Mentor II* as the "auction litigation."

**14.** Mentor contends that its successful invalidation of the DRP forced Quickturn to conform to the requirements of Delaware law, and removed an impermissible restriction on

a new board's ability to obtain a value-maximizing transaction.

**15.** Del.Ch. Consol. C.A. Nos. 10825 & 10907, Chandler, V.C., 1990 WL 189120 (Nov. 27, 1990).

**16.** *CM & M Group, Inc. v. Carroll,* Del.Supr., 453 A.2d 788, 795 (1982).

Second, defendants urge that in any event, Mentor is equitably barred from seeking a fee from Cadence, because (i) any fee to which Mentor would be entitled would be owed by the "common fund," which now rests in the hands of the former Quickturn stockholders or the persons who purchased from those former stockholders after May 1999, (ii) even if the payment of a "common fund" fee were otherwise appropriate, Mentor is barred by laches, because it sat on its fee claim for over one year while the common fund it claims to have created was distributed, and (iii) Cadence never agreed to pay Mentor's fees, and there is no basis to require Cadence to pay those fees now.

Mentor's reply is multifold. First, Mentor argues that the controlling authority on this motion is not *Dunkin' Donuts* but, rather, the Supreme Court's decision in *Tandycrafts, Inc. v. Initio Partners* ("*Tandycrafts*").[17] Mentor argues that *Tandycrafts* establishes that any shareholder litigant that satisfies the three-pronged test for fee-entitlement has standing to seek a fee, and creates no exception for shareholders who happen to be bidders for control. Second, Mentor contends that to the extent *Dunkin' Donuts* holds the contrary, it is inconsistent with *Tandycrafts*, and is therefore not the law of Delaware. Third, Mentor claims that even if *Dunkin' Donuts* is good law, that case is not dispositive of this motion because it is factually distinguishable from this case in various respects. Fourth, and finally, Mentor contends that it is not equitably barred from seeking a fee award from Cadence, because: (i) Cadence benefited from Mentor's litigative efforts by being enabled to acquire Quickturn, (ii) even if the sole beneficiaries were the former Quickturn stockholders, by paying Mentor's fee, Cadence would be acting as the "agent" for those former stockholders who now own a pro-

portionate interest in Cadence, and (iii) Mentor is not guilty of laches because it did not delay unreasonably in a manner that caused Quickturn or Cadence any prejudice.

## III. LEGAL ANALYSIS

These colliding contentions are reducible to three issues that are presented on this motion. The first is whether the rule articulated in *Dunkin' Donuts*—that a losing bidder for control lacks standing to apply for fees—controls this case. If it does, that raises the second issue, which is whether *Dunkin' Donuts* is inconsistent with, and superseded by, a contrary principle announced by the Supreme Court in *Tandycrafts*. The third issue becomes whether in any event Mentor is equitably barred from seeking a fee award against Cadence.

I address those issues in that order.

### A. Whether Dunkin' Donuts Controls This Case

#### 1. *The Dunkin' Donuts Case Summarized*

The first issue—whether *Dunkin' Donuts* controls this case—requires a brief description of that decision and a comparison of its facts to those presented here. In *Dunkin' Donuts*, Kingsbridge Capital Corporation ("Kingsbridge"), the hostile bidder, contacted Dunkin' Donuts, the target corporation, to discuss the possibility of a friendly acquisition. Dunkin' Donuts responded that it was not for sale and refused to meet with Kingsbridge. Shortly thereafter, Kingsbridge, like Mentor, initiated a two-pronged strategy of tender offer and litigation. The tender offer was for all outstanding shares of the target corporation for $43 per share, and the litigation sought to dismantle the target

17. Del.Supr., 562 A.2d 1162 (1989).

company's defensive measures. There, as here, shareholders filed class action lawsuits. The class plaintiffs and the hostile bidder coordinated their attack, both alleging that the target company board had breached its fiduciary duties in resisting the hostile bid.

Then–Vice Chancellor (now Chancellor) Chandler denied the hostile bidder's motion for a preliminary injunction, and thereafter the hostile bidder raised its offer and sought an expedited trial. The target company rejected the raised offer and publicly announced that it had retained advisors to explore all value-maximizing alternatives. In an ensuing auction, the $47.25 per share bid of a competing bidder (Allied–Lyons) prevailed over Kingsbridge's $45 per share bid. Even though Kingsbridge was the losing bidder it, like Mentor here, made a profit on its investment in the target company's stock.

Before the acquisition closed, the Dunkin' Donuts shareholder plaintiffs, like the shareholder plaintiffs here, moved to enjoin the transaction or place into escrow a portion of the proceeds to create a fund out of which a court-awarded attorneys' fee could be paid. To settle the dispute, the successful bidder agreed to pay class counsel fees and expenses, but retained the right to dispute whether any fee was owed. Kingsbridge, like Mentor here, did not take part in the injunction motion, nor did it make a similar motion. Nonetheless, Kingsbridge (together with the class plaintiffs) applied for an award of counsel fees.

Vice Chancellor Chandler concluded that Kingsbridge was not entitled to a fee. In its analysis of Kingsbridge's claim, the Court started by recognizing the "so- called American Rule under which a prevailing party is responsible for the payment of his own counsel fees in the absence of statutory authority or a contractual undertaking to the contrary."[18] The Court noted that there were limited exceptions, including the common fund and the corporate benefit doctrines, and concluded that that case would fall under the common fund theory, because "either the common fund or the corporate benefit doctrine, [but] not both," would apply.[19] Under the common fund doctrine, "where a fund is created, fees will normally be paid from that fund since that is the most appropriate method of spreading the costs of the litigation."[20]

The Court concluded that Kingsbridge was not entitled to a fee, finding that:

Kingsbridge's efforts were not aimed at securing a sale of Dunkin' Donuts to the highest bidder. Rather, Kingsbridge's lawsuit was but one element of its strategy to acquire the target. In other words, Kingsbridge's lawsuit—and the costs associated with it—was part of the price it considered worth paying in the acquisition effort .... It is therefore Kingsbridge's position as a bidder for control of Dunkin' Donuts that undercuts its claim for fees and expenses.[21]

Noting that "[t]his Court has never compensated a shareholder for costs incurred in litigation related to an attempt to acquire a corporation,"[22] the Vice Chancellor identified two reasons. The first is that although a bidder for control may be a stockholder, its stockholder status is secondary to its status as a bidder, whose interests are inherently in conflict with

---

**18.** *Dunkin' Donuts,* Mem. Op. at 6–7.

**19.** *Id.,* at 6–7, 8.

**20.** *Id.* at 8–9. The Court also noted that the basis for each doctrine is the same, *viz.,* that

"those benefited should compensate whoever causes the benefit." *Id.* at 8.

**21.** *Id.* at 19.

**22.** *Id.* at 20.

those of the target company public stockholders. As the Court observed:

> A bidder's objective is to identify an underpriced corporation and...acquire it for the lowest price possible. It is a straightforward investment decision. When the bidder, as in the typical situation, owes no duty to stockholders, it has no obvious reason to try to "maximize shareholder value." Indeed, its interest, if successful, will minimize shareholder value. Stockholders, on the other hand, do not care if the bidder gets a "good deal," they want the most compensation available for their holding in the company.[23]

The second reason for denying a fee award to Kingsbridge was that "the policy rationale underlying [the] exceptions [to the American Rule] is ...clearly inapplicable to bidders attempting to acquire a corporation." The policy rationale underlying the "common fund" doctrine is that fee shifting "provides a needed incentive to shareholders to bring therapeutic action on behalf of a large and diffused class of shareholders who do not have the organizational ability or funds to seek redress themselves."[24] On the other hand, the Court emphasized, "it strains reason to contend that bidders need the added incentive of fee shifting," because:

> Bidders, unlike [the class of diffused shareholders] are not organizationally disadvantaged. Indeed the typical bidder is a well organized and well financed individual or small group of individual stockholders. They usually have vast resources that may be tapped to fund lawsuits necessary to advance their investment strategy....Bidders have the incentive of their investment objective—acquiring an underpriced target company and reaping the resulting profit. Of

course, this investment objective, like most investments, has risks. A bidder hires experts to identify (and to investigate) underpriced corporations. It may also initiate lawsuits in order to counter defensive strategies by the target's management. These information and litigation costs represent a part of the bidder's entire purchase price ...Investment costs such as information and litigation costs ...seem to represent a relatively small piece of the financial picture in most transactions.[25]

The Court also rejected Kingsbridge's argument that the successful bidder should be the party obligated to pay Kingsbridge's fees, because "[s]hifting legal fees to the successful competing bidder appears inconsistent with the principle underlying the common fund and corporate benefit doctrines that the benefited class should foot the bill of whoever causes the benefit to be conferred. In what sense can it be said that Allied Lyons [the successful bidder] is the benefited class (or even part of the benefited class)?"[26]

The Court concluded that "no good reason exists ...for shifting to the winning bidder the litigation (investment) costs of the losing bidder," a conclusion even "more obvious" where the unsuccessful bidder has "hedged" against failure by acquiring a large, cheap block of the target company's stock that it tendered to the winning bidder at a substantial profit:

> Having effectively hedged its investment risks, it is not at all clear to my why this Court should increase the rate of return on Kingsbridge's investment by shifting part of its costs to its competitor. All of these considerations are underscored by the actual fee arrangement in this case.

---

23. *Id.* at 20–21.

24. *Id.*

25. *Id.* at 22.

26. *Id.* at 23.

Kingsbridge's attorneys were not employed on a contingency basis; they were employed on an hourly basis and have already been paid for their services.[27]

### 2. Mentor's Attempt to *Distinguish Dunkin' Donuts*

Insofar as their pivotal facts are concerned, *Dunkin' Donuts* and this case are indistinguishable. Mentor, like Kingsbridge, made a hostile tender offer, commenced litigation in aid of that offer that, together with shareholder class actions, sought also to dismantle certain target company defenses. Mentor, like Kingsbridge, bought a significant block of the target company's stock on which it made a profit. Mentor, like Kingsbridge, was unsuccessful in acquiring the target company, and sought to shift its costs to the successful bidder. Accordingly, the rationale of *Dunkin' Donuts* is applicable to, and controls, this case.

Mentor does not frontally dispute the holding or rationale of *Dunkin' Donuts*. Rather, Mentor asserts that *Dunkin' Donuts* is not controlling authority because it was a "carefully limited, fact-specific decision" that is not *stare decisis* and, moreover, is distinguishable from this case in three critical respects.

First, Mentor argues that it (unlike Kingsbridge) waged a proxy contest with the goal of electing independent nominees who would consider all options for Quickturn, including an auction of the company. Second, Mentor claims that it (unlike Kingsbridge) pursued litigation (*Mentor II*) in which it sought to compel a full and fair auction of Quickturn. Third, Mentor argues that it (unlike Kingsbridge) prevailed in its DRP litigation (*Mentor I*), thereby invalidating the DRP, and leading directly to the Cadence merger and to a

significant resulting monetary benefit to Quickturn stockholders.

None of these "distinctions" is legally relevant or factually accurate. They amount to an effort to rewrite history, which can only be accomplished by ignoring the earlier findings of this Court and Mentor's own disclosures to Quickturn's shareholders, and by advancing arguments that require the reader to sever all connection with reality.

To begin with, it is correct that in *Dunkin' Donuts* the hostile bidder (Kingsbridge) did not succeed in obtaining an injunction against the target company's takeover defenses or in rescinding the placement of target company stock into friendly hands. But, that fact played no part in the *Dunkin' Donuts* Court's analysis or decision. What was critical to the Court's analysis is that Kingsbridge was a bidder for control and, as such, needed no fee award-incentive to bring its lawsuit. Nowhere in its opinion did this Court suggest that the outcome would be different had Kingsbridge prevailed on its preliminary injunction and summary judgment motions.

Mentor next attempts to distinguish *Dunkin' Donuts* on the ground that Mentor (unlike Kingsbridge) was not the "typical" bidder whose goal is to acquire the target company for as little as possible. To the contrary, Mentor asserts, it (again, unlike Kingsbridge) waged a proxy contest with the goal of electing independent nominees who would consider all options for Quickturn, including an auction of the company. Even if that argument were factually accurate it is legally irrelevant, because it presupposes that the Court must conduct a factual inquiry into the bidder's subjective motive, awarding a fee if it finds that the bidder's intent was to "ensure that

---

27. *Id.* at 24.

the...stockholders would have the opportunity to receive maximum value," and denying a fee if it finds that the bidder was "seeking to acquire the target for as little as possible."[28] Nothing in *Dunkin' Donuts* contemplates that kind of inquiry.

The *Dunkin' Donuts* Court recognized the reality that bidders have economic interests that are inherently and structurally in conflict with the target company's stockholders' interest in receiving maximum available value. A bidder for control, like any rational buyer, wants (and has a fiduciary duty to its own investors) to acquire the target company as cheaply as possible. No self-serving protestations to the contrary or benign self-characterization by the bidder can alter that reality. Moreover, the fact that Mentor attempted to replace the incumbent Quickturn board with its own nominees, does not support, let alone require acceptance of, Mentor's insistence that its objective was to maximize the value that Mentor's shareholders would receive.[29] Indeed, Mentor's conduct shows that it had the opposite intent.

Mentor's conduct confirms that its objectives were no different from those of any "typical bidder" for control: to acquire Quickturn as cheaply as possible under conditions—which Mentor assiduously strived to create—that would minimize the likelihood of a bidding war. To accept Mentor's attempted self-portrayal as the friend and champion of Quickturn's shareholders would require the Court to blind itself to reality and ignore Mentor's own actions.

Mentor's pretense ignores the Court's explicit finding in *Mentor I*, that Mentor

deliberately waited until the 1998 Asian economic downturn, when Quickturn's stock price had reached a significant low, to make its bid. Mentor also glosses over the fact that its initial takeover salvo was one step short of a blitzkrieg, Mentor's Chairman having told his counterpart at Quickturn of Mentor's plans only at dinner the night before the tender offer was launched. Even then, Mentor rebuffed Quickturn's Chairman's request for additional time to allow Quickturn's board to consider whether to negotiate with Mentor.

The rebuff was hardly a surprise: any negotiations would put the target's board in the driver's seat, because the board had available to it Quickturn's shareholder rights plan, as well as the leverage conferred by Delaware's takeover statute, 8 *Del. C.* § 203. The rights plan would prevent Mentor from acquiring the shares tendered into its offer without the board's prior agreement either to redeem the "pill" or waive its application to Mentor. Section 203 could prevent a second-step Mentor/Quickturn merger for three years unless the board waived the application of the statute.[30] No such waivers would be forthcoming unless Mentor was willing to offer a price the board could not refuse. The most elegant proof that Mentor had no intention to offer such a price is that Mentor refused to negotiate with the Quickturn board, and instead waged a proxy contest to replace the board with Mentor's own nominees who would proceed to dismantle the pill. Mentor was not (as it now claims to be) motivated to

---

**28.** Mentor Opening Br. in Support of Fee Application, at 44.

**29.** Moreover, as a legal matter, whatever may be the objective of waging a proxy contest, the objective is irrelevant, because no fee could be sought for a corporate benefit conferred by

a proxy contest brought in conjunction with litigation. *Waterside Partners v. C. Brewer Co.*, Del.Supr., 739 A.2d 768, 770 (1999).

**30.** Assuming, of course, that Mentor acquired at least 15% of Quickturn's shares in its offer.

achieve maximum value for Quickturn's stockholders.

Mentor vigorously resists that intuitively obvious conclusion. It insists that its nominees, if elected, intended to achieve maximum value for Quickturn's shareholders. Mentor's rhetoric ignores its own proxy statement disclosure to Quickturn's shareholders, that its proposed director nominees would "act to facilitate the proposed [Mentor] transaction...." Mentor's proxy statement also disclosed that:

> If the nominees are elected, [Mentor]...expects that, subject to their fiduciary duties under applicable law, the Nominees would redeem the Rights (or amend the Rights Agreement to make the Rights inapplicable to the Offer and the Proposed Merger) and approve the Offer and the Proposed Merger under Section 203, which would satisfy the Rights Condition and the Section 203 Condition, and take such other actions as may be required to expedite the prompt consummation of the Proposed Acquisition by means of the Offer and the Proposed Merger.[31]

Third, Mentor strives to distinguish this case from *Dunkin' Donuts* by arguing that Mentor, unlike Kingsbridge, commenced litigation to force an auction that would—and ultimately did—maximize value for Quickturn's shareholders. The undisputed facts show, however, that while an auction did occur, Mentor did not bring its second lawsuit (*Mentor II*) to compel an open auction or to promote competitive bidding. Rather, Mentor brought its lawsuit to undo the competing bidding that had already taken place. The primary relief sought in *Mentor II* was to block the Cadence/Quickturn deal, because (as the record shows) Mentor could not or would not outbid Cadence. At no time did Mentor ever make a bid that was competitive with or superior to, Cadence's. What bids Mentor did make in response to the Cadence bid were partial offers with an uncertain (and, in one case, with no) backend. Mentor's goal in *Mentor II* was to facilitate its own proposed transaction, not a transaction that would yield the highest value for Quickturn's shareholders.[32]

Mentor's insistence that it filed litigation motivated by the desire to force an open auction also overlooks the fact that once Mentor was outbid by Cadence, Mentor departed the scene and canceled the very shareholders' meeting it had previously called.[33] If, in fact, the goal of Mentor's "independent board nominees" was to promote an open bidding contest without regard for whether Mentor was the winner, then presumably those nominees would have continued to seek office even after Mentor withdrew from the competition. The simple truth is that once Mentor was unable to acquire Quickturn in a bidding contest, Mentor had no further interest in who served on Quickturn's board.

\* \* \*

To summarize, *Dunkin' Donuts* and this case are factually indistinguishable. Therefore, *Dunkin' Donuts*—if it remains good law—is controlling authority and

---

**31.** Mentor App., Exh. 5 (Mentor Proxy Statement dated September 11, 1998).

**32.** Similarly, the goal in *Mentor I* (the "DRP litigation") was not, as Mentor claims, to open up the field to competitive bidding, but, rather, to facilitate Mentor's bid by removing the six-month delay impediment to a Mentor-sponsored board pursuing a transaction with Mentor.

**33.** In addition (it will be recalled), after Cadence made its superior bid, Mentor attempted (unsuccessfully) to obtain an injunction against the holding of that shareholders' meeting, first in this Court and then in the Federal Court.

forecloses Mentor's fee application. Mentor contends, however, that *Dunkin' Donuts* does not represent the authoritative Delaware law on this issue, because: (i) *Dunkin' Donuts* is inconsistent with, and therefore is superseded by, the Supreme Court's decision in *Tandycrafts;* and (ii) in any event, *Dunkin' Donuts* was wrongly decided as a matter of policy, and therefore should not be followed. The core issue—whether *Dunkin' Donuts* is authoritative and sound Delaware law—is next addressed.

## B. Whether Dunkin' Donuts Represents Authoritative, Sound Delaware Law

### 1. *The Tandycrafts Decision*

Mentor argues that even if *Dunkin' Donuts* controls these facts, it is inconsistent with *Tandycrafts,* which confers standing to seek an attorneys' fee upon any shareholder that satisfies the three criteria for a fee award. Because *Tandycrafts* does not distinguish between shareholders that are bidders for control and those that are not, so the argument goes, it must be concluded that Delaware law recognizes no such distinction. Thus, to the extent *Dunkin' Donuts* holds otherwise, it does not represent Delaware law.

Mentor reads *Tandycrafts* far too broadly. Insofar as that case is relevant to the issue presented here, it holds only that "under certain circumstances, counsel fees may be awarded to an individual shareholder whose litigation confers a benefit upon the corporation, notwithstanding the absence of a class or derivative component." [34] *Tandycrafts* did not decide, or even address, the issue presented here, which is whether a shareholder-litigant's status as a bidder for corporate control deprives it of standing to seek attorneys fees for a corporate benefit resulting from

litigation brought by the shareholder as part of its takeover strategy.

In *Tandycrafts,* the plaintiff, which was the corporation's largest (9.9%) single independent shareholder, approached management about possibly acquiring a larger, and perhaps controlling, interest in the company. Management rebuffed that suggestion, and responded by proposing a charter amendment that would impose an 80% supermajority voting requirement to approve takeover proposals made without director approval. The plaintiff filed suit, claiming that the proxy disclosures in connection with the proposed charter amendments were defective in various respects, and seeking to enjoin the shareholders' meeting on that basis. The plaintiff also launched a proxy contest in which it sought to counter what it viewed as distortions in the board's proxy materials seeking support for the board's proposals. Unlike this case or *Dunkin' Donuts,* the plaintiff in *Tandycrafts* did not make a hostile bid for control, nor did it use the proxy contest as a vehicle to replace the incumbent board.

While the plaintiff's preliminary injunction motion was pending, the corporation mooted the proxy disclosure dispute by distributing a supplement to its proxy statement that disclosed the information the plaintiff contended was required. Because the supplemental disclosure had mooted the disclosure claim, this Court denied injunctive relief. The plaintiff thereupon moved to dismiss the action and applied for attorneys fees. The corporation opposed the application on the sole ground that the lawsuit did not create any fee-compensable benefit, because the supplemental disclosure would have been made irrespective of the litigation. Unlike *Dunkin' Donuts* and this case, the corporation did not oppose the fee application on

---

34. 562 A.2d at 1163.

the ground that the plaintiff's status as a bidder for control deprived it of standing. That is understandable, since the plaintiff was not a bidder for control.

This Court held that the plaintiff was entitled to a fee. The corporation appealed, on the grounds that the amount of the fee award was unreasonable and that this Court had erred as a matter of law in ruling (implicitly) that a party suing for his own benefit, and not on behalf of a class or derivatively, is entitled to an award of counsel fees against the corporation. The Supreme Court rejected those arguments and affirmed.

The issue presented in *Dunkin' Donuts* was not presented or decided, explicitly or implicitly, in *Tandycrafts*.[35] Accordingly, *Tandycrafts* cannot fairly be read to support Mentor's broad proposition that any shareholder whose litigative efforts creates a compensable benefit for the corporation or the shareholder class has standing— categorically and regardless of the circumstances—to seek a court-awarded fee.

*Tandycrafts* articulates no such rule, and therefore that case does not undercut the principle for which *Dunkin' Donuts* stands.

### 2. The Soundness of *Dunkin' Donuts* on Policy Grounds

Lastly, Mentor attacks *Dunkin' Donuts* on the basis that it relies on "an overly narrow policy rationale" that "neglects two broader rationales that support awards of fees regardless of a stockholder's status as a bidder."[36] The first rationale (according to Mentor) is "the important public policy of requiring individuals who benefited from litigation to 'share in the costs of achieving that benefit.' "[37] The second rationale is that "allowing a bidder to recover fees provides bidders with a greater incentive to police transactions, identify improper conduct by fiduciaries, and enforce the strictures of Delaware statutory and common law."[38] Neither argument has merit.

**35.** Mentor finds support for its position in the Supreme Court's determination that a shareholder that sues "for its own benefit" is entitled to a fee award, 562 A.2d at 1165. Mentor attempts to stretch the meaning of that language to include hostile bidders who bring litigation "for their own benefit." When read in context, however, it becomes apparent that in employing that language the Court was referring to plaintiffs who sue individually, rather than on behalf of a class or in a representative capacity. *Id.*

**36.** Mentor Reply Br. at 22.

**37.** *Id.* (citations omitted).

**38.** *Id.* Mentor also criticizes *Dunkin' Donuts* for ignoring what it characterized as prior Delaware case law allowing compensation to a shareholder for costs incurred in litigation related to an attempt to acquire a corporation. Mentor points to *Tandycrafts, Allied Artists Pictures Corp v. Baron,* Del.Supr., 413 A.2d 876 (1980); and *Richman v. DeVal Aerodynamics,* Del. Ch., 185 A.2d 884 (1962) as

that prior Delaware case law. Mentor is wrong. Not only is *Tandycrafts* inapposite authority for the reasons previously discussed, but also Mentor misreads the other authorities as well. The plaintiff in *Allied Artists* was not a bidder for control, and indeed held only 10 shares. The plaintiff in *Richman* was not a bidder for control either, but was a class action representative who had successfully obtained an injunction requiring the calling of a stockholders' meeting and prohibiting the board from taking action (granting stock options to key employees and binding them to a 2 year contract) that a majority of the stockholders considered detrimental to the corporation. Rejecting the argument that the plaintiff had acted solely in the interest of a limited group of stockholders and had therefore conferred no benefit on the corporation or the shareholders generally, the Court found that the litigation was "designed to protect rights which belonged to the class of which the plaintiff was a member and...that the benefits...were such as to require, in equity, payment by the class as a whole." 185 A.2d at 886.

That individuals who benefit from the litigative efforts of others should share in the costs of achieving that benefit is (as Mentor correctly points out) one policy reason why courts award attorneys' fees. But that is not the only policy sought to be furthered by fee awards. Mentor ignores a second policy that underlies the common fund/common benefit exceptions to the American Rule—the need to create an incentive for shareholders (who would otherwise have no reason) to bring litigation to enforce duties owed by corporate fiduciaries to shareholders. Mentor's argument, if accepted, would undercut this policy, because bidders for corporate control have no need for any fee-award incentive to bring lawsuits which further their self-interest in acquiring corporate control. That is, the opportunity to acquire control at a price acceptable to a bidder is itself the incentive for the bidder to absorb the cost of bringing the litigation. In contrast, a stockholder-plaintiff who does not seek control will normally have no reason to incur litigation expenses that would far outstrip the benefit he or she would receive individually if the lawsuit were successful. Only by assuring such a shareholder plaintiff that if successful its expenses will be reimbursed by all the beneficiaries (the corporation or the shareholder class), would that shareholder have any incentive to bring the litigation.

Mentor's policy arguments are factually inapplicable to this case, because Mentor is not seeking to recover fees against from the persons who received the benefit; *i.e.,* the former Quickturn shareholders whose shares were purchased at a premium by Cadence. Instead, Mentor is seeking a fee award against Cadence itself. As discussed elsewhere in this Opinion, there is no basis in law or policy to force the winning bidder to pay the expenses of the loser.[39]

Mentor's response is to argue, inconsistently, that (i) Cadence was a beneficiary of Mentor's litigative success, since the invalidation of the DRP led to an auction that enabled Cadence to acquire the company, and (ii) even if the sole beneficiaries were the former Quickturn stockholders, by paying Mentor's fee Cadence would be doing so on behalf of (*i.e.,* as "agent" for) Quickturn's former stockholders, who now own a proportionate interest in Cadence.

These arguments border on the frivolous. While as a matter of happenstance the invalidation of the DRP resulted in an auction that Cadence happened to win, that result was the opposite of what—and, indeed was the last thing that—Mentor was striving to achieve in its DRP litigation. The objective of *Mentor I* was to eliminate a barrier to *Mentor's* acquiring Quickturn before any competition could emerge. It was not to enable the highest bidder to win, any more than Mentor's "auction litigation" was brought to promote a full and fair auction.

Similarly disconnected from reality is Mentor's suggestion that even if the sole beneficiaries were the former Quickturn stockholders, requiring Cadence to pay Mentor's attorneys' fees is equivalent to imposing the fee upon those former stockholders because of their proportionate interest in Cadence. That argument ignores the fact that the greatest share of the cost of creating the benefit would be borne by persons who were not beneficiaries—the Cadence shareholders who were never shareholders of Quickturn. The argument might have merit if *all* Cadence stockholders were the former stockholders of Quickturn, but that was not the case at the time

---

**39.** The fact that Mentor is seeking fees from a party other than the persons who received the benefit is an independent reason why its fee application must be denied. See Part III C, *infra,* of this Opinion.

of the merger, nor is it the case now. As counsel for Quickturn/Cadence represented at oral argument, at the time the merger was consummated, only 2% of the stockholders of the combined corporation were stockholders of the former Quickturn, and today, after three years of stockholder "turnover," that percentage would be far less.

Equally meritless is Mentor's second policy argument—that awarding fees will create a greater incentive for bidders to "police" the conduct of corporate fiduciaries, identify wrongdoing, and force their observance of fiduciary duties. Mentor's argument assumes its own conclusion. No "greater" incentive is needed to encourage bidders to engage in such activity, because *no* incentive is needed at all. This kind of "monitoring" role in corporate control litigation is reserved for stockholder plaintiffs that are unaffiliated with the bidder. It is for those plaintiffs—not for bidders for control whose interests are in conflict with those unaffiliated stockholders—that fee-award incentives for monitoring are judicially recognized.[40]

Moreover (and as this Court pointed out in *Dunkin' Donuts*), it seems ludicrous to suppose any additional incentives are needed in this specific case. As a result of losing the bidding war, Mentor realized a potential profit of approximately $13 million on its investment in its Quickturn stock which Mentor tendered into Cadence's offer. What significant policy principle is vindicated by allowing Mentor also to recover its litigation costs?

Finally, there are other compelling policy reasons why the rationale of *Dunkin' Donuts* is sound and should be adhered to. A rule that required the winning bidder to pay the losing bidder or bidders would perversely alter the dynamics of a bidding contest, to the detriment of the target company stockholders who are the intended beneficiaries of the competitive bidding. If Mentor's argument were adopted as Delaware law, it would induce every bidder for control reflexively to file an "auction lawsuit" to establish its "standing" to apply for an award of fees. That prospect would change the strategic calculations of each of the competing bidders, because it would induce those bidders, in formulating their bids, to take into account—and subtract from their offering price(s)—the amount of estimated litigation costs they would have to pay the losing bidders. Moreover, bidders that might otherwise be inclined to top an existing bid to avoid coming up empty after incurring substantial deal expenses would now have an incentive to consider simply dropping out of the bidding, and collecting (in addition to any profit on their target company stock) an award of attorneys' fees and costs. A rule that encourages bidders for control to engage in that kind of behavior should be abjured.

\* \* \*

■ For all these reasons, I conclude that the principle announced in *Dunkin' Donuts*—that bidders for corporate control whose litigation confers a benefit on the corporation or its unaffiliated stockholders do not have standing to seek a court-awarded attorneys' fee from those persons who received the benefit—is the law of Delaware and is sound law that applies fully to this case.

## C. Whether Mentor Is In Any Event Equitably Barred From Seeking Attorneys' Fees From Cadence

Given the conclusion just reached, the analysis could end here. But, if a review-

---

**40.** *Robert M. Bass Group, Inc. v. Evans,* Del. Ch., C.A. Nos. 9953 & 9909, Mem. Op., Ja-  cobs, V.C., 1989 WL 137936 (Nov. 16, 1989).

ing court were to reach a different conclusion; *i.e.*, were to hold that Mentor's status as a bidder does not deprive it of standing to apply for an attorneys' fee, Mentor would still not be entitled to a fee award.

█ In cases where the fee-compensable benefit consists of the creation of a fund, the fee is payable from the fund or, failing that, by those persons to whom the fund was distributed. In this case, Mentor does not seek to recover fees from the "fund" (here, the incremental acquisition price paid by Cadence above Mentor's offering price) or from the persons who benefited from that fund—the former Quickturn shareholders to whom the fund was distributed. Rather, Mentor seeks to recover fees from Cadence, which was not a beneficiary of its Mentor' litigative efforts and never agreed to pay Mentor's fees. That cannot be. Requiring Cadence to pay Mentor's litigation expenses would be a totally unprincipled result which runs counter to the rationale that those who receive the benefit from a shareholder's litigative efforts should share the costs of creating that benefit. In short, Mentor's application must fail because Mentor seeks fees against the wrong party.

█ Mentor's application must fail on a second, independent ground, namely, that its conduct equitably bars it from seeking relief against Cadence. Mentor had a full and fair opportunity to recover fees from the proper source; *i.e.*, the fund itself. The conduct of the shareholder plaintiffs proves the point. The shareholder plaintiffs, unlike Mentor, proceeded in a manner consistent with the common fund rationale. They sought to restrain Cadence from distributing the acquisition proceeds

and to require Cadence to set aside a portion of those proceeds for the payment of an attorneys' fee award. That application resulted in an agreement by Cadence to pay the shareholder plaintiffs' attorneys' fees, and by the shareholder plaintiffs to withdraw their injunction application. Mentor could have proceeded in like fashion, but it did not.[41] Instead, Mentor sat by and allowed the acquisition proceeds to be distributed to the former Quickturn shareholders, and not until fourteen months later did Mentor apply for an attorneys' fee award—against Cadence. The result of Quickturn's unreasonable delay was to prejudice Cadence, because had Quickturn made a timely application, Cadence could have sought to protect itself by setting aside a portion of the merger consideration to respond to Mentor's fee claim. Thus, Mentor's fee application is also equitably barred by the doctrine of laches.

## IV. CONCLUSION

For the reasons set forth above, the plaintiffs' motion for an award of attorneys' fees and expenses is denied. **IT IS SO ORDERED.**

---

41. In *Dunkin' Donuts,* the successful bidder agreed to pay all awards of counsel fees (including any award to Kingsbridge) in exchange for the plaintiffs' agreements not to oppose the distribution of the purchase price to the target company shareholders. The successful bidder reserved its right, however, to oppose the claimants' entitlement to fees.

---

Mentor has not shown why that procedure could not have been followed here.

