**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| IN RE ORCHARD ENTERPRISES, INC. | ) | Consolidated |
|---|---|---|
| STOCKHOLDER LITIGATION | ) | C.A. No. 7840-VCL |

**MEMORANDUM OPINION**

Date Submitted: June 30, 2014
Date Decided: August 22, 2014

James R. Banko, FARUQI & FARUQI, LLP, Wilmington, Delaware; Samuel J. Lieberman, SADIS & GOLDBERG LLP, New York, New York; James S. Notis, Jennifer Sarnelli, GARDY & NOTIS, LLP, New York, New York; *Attorneys for Plaintiffs*.

William M. Lafferty, Jay N. Moffitt, Bradley D. Sorrels, Christopher P. Quinn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Defendants Michael Donahue, David Altschul, Viet Dinh, Joel Straka, and Nathan Peck*.

Philip Trainer, Jr., Toni-Ann Platia, ASHBY & GEDDES, P.A., Wilmington, Delaware; Kenneth J. Pfaehler, David I. Ackerman, DENTONS US LLP, Washington, District of Columbia; *Attorneys for Defendants The Orchard Enterprises, Inc., Dimensional Associates, LLC, Daniel Stein, and Bradley Navin*.

Ronald A. Brown, Jr., Marcus E. Montejo, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Attorneys for Objectors Merlin Partners LP, Quadre Investments, LP, Matthew Giffuni, and Christopher Yeagley*.

**LASTER, Vice Chancellor.**

The plaintiffs in this action filed suit on behalf of a class comprising the minority stockholders of The Orchard Enterprises, Inc. ("Orchard" or the "Company"). They challenged a cash-out merger between Orchard and its controlling stockholder Dimensional Associates, LLC ("Dimensional"), which they claimed resulted from breaches of fiduciary duty by Dimensional and the members of Orchard's board of directors. The case settled for a payment by the defendants of $10,725,000 to the class.

Stockholders who litigated an earlier appraisal proceeding to a final judgment objected to the settlement. They contended that their efforts contributed causally to the creation of the settlement fund and that they accordingly should be reimbursed for their counsel's fees and expenses.

On the facts presented here, the benefit conferred by the settlement resulted from serial contributions by the appraisal claimants and stockholder plaintiffs. Because the appraisal claimants were content to pursue only their own interests in the appraisal proceeding and did not undertake to serve the interests of the class as a whole, they lack standing to obtain a fee award. The stockholder plaintiffs in this action have standing to pursue a fee award, and their counsel is entitled to $2,250,000.

## I. FACTUAL BACKGROUND

On July 29, 2010, Dimensional and Orchard effected a merger in which the shares of Orchard common stock, other than those held by Dimensional, were converted into the right to receive $2.05 per share (the "Merger"). At the time of the Merger, Dimensional and its affiliates held approximately 42% of Orchard's common stock and 99% of its

1

Series A Convertible Preferred Stock. Through those holdings, Dimensional controlled approximately 53.3% of Orchard's outstanding voting power.

After the Merger closed, certain Orchard stockholders perfected their appraisal rights (the "Appraisal Claimants"). They hired lawyers ("Appraisal Counsel") and entered into engagement letters to govern the representation, including Appraisal Counsel's fees and expenses. Appraisal Counsel filed and litigated an appraisal proceeding on the Appraisal Claimants' behalf.

On March 3, 2012, while the appraisal proceeding was pending, Dimensional entered into an agreement with Sony Music that provided for a merger of Orchard with a Sony entity at a valuation materially higher than $2.05 per share (the "Orchard/Sony Merger"). Appraisal Counsel did not pursue discovery concerning the Orchard/Sony Merger. In July 2012, Chief Justice Strine, then Chancellor, determined that the fair value of Orchard's common stock at the time of the Merger was $4.67 per share. *See In re Appraisal of Orchard Enters., Inc.*, 2012 WL 2923305 (Del. Ch. July 18, 2012), *aff'd sub nom. Orchard Enters., Inc. v. Merlin P'rs LP*, 2013 WL 1282001 (Del. Mar. 28, 2013) (TABLE).

Two months later, and over two years after the Merger closed, the plaintiffs filed this breach of fiduciary duty action (the "Plenary Action"). The plaintiffs retained different counsel to litigate their breach of fiduciary duty claims ("Plenary Counsel"), although one of the law firms had played a role in the appraisal proceeding. The Appraisal Claimants and their counsel were aware of the Plenary Action, but they did not

2

seek to intervene, whether to take over the litigation or to otherwise assist the class. They sat back and waited to see how the Plenary Action turned out.

After completing fact discovery, the parties to the Plenary Action filed cross motions for summary judgment. The plaintiffs sought determinations as a matter of law that the defendants had breached their duty of disclosure, that entire fairness was the operative standard of review, and that the Merger was not entirely fair. They also sought determinations as a matter of law that Dimensional and certain directors had breached their duty of loyalty and that judgment should be entered against them. The defendants resisted these determinations and sought rulings as a matter of law that the directors who served on a special committee were exculpated from liability and that neither rescissory damages nor quasi-appraisal were available remedies. The plaintiffs had named Orchard as a defendant, and Orchard argued that it could not be held liable for breach of fiduciary duty or for aiding and abetting.

The parties' cross motions were addressed in an opinion dated February 28, 2014. *See In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1 (Del. Ch. 2014). The opinion denied the plaintiffs' motion except in two limited respects: (i) one of the claimed disclosure violations constituted a material misrepresentation as a matter of law, and (ii) the standard of review for trial would be entire fairness with the burden of persuasion on the defendants. The opinion also denied the defendants' motions except in two limited respects: (i) one of the allegedly misleading disclosure violations was factually accurate, and (ii) the plaintiffs could not hold Orchard liable on any of the theories asserted.

3

On April 28, 2014, the parties filed a stipulation and agreement of settlement that resolved the Plenary Action in exchange for a payment by the defendants of $10,725,000. The stipulation called for the payment to be allocated across the entire class, including the Appraisal Claimants, so that all of the minority stockholders would receive a nominally equal amount for their shares. The stipulation contemplated that Plenary Counsel would apply for an award of attorneys' fees and expenses. It did not contemplate that Appraisal Counsel would make a fee application or that the Appraisal Claimants would be reimbursed for Appraisal Counsel's fees and expenses.

The Appraisal Claimants objected to the allocation of the settlement consideration and the request for an award of attorneys' fees and expenses. The Appraisal Claimants maintained that their counsel's efforts contributed causally to the creation of the $10,725,000 fund and that accordingly they should be reimbursed for the fees and expenses that they incurred in the appraisal proceeding. The Appraisal Claimants advanced a related objection to the allocation of consideration in which they argued that if they had to bear counsels' fees, they would receive less consideration than the other minority stockholders on a net, per share basis.

After holding a fairness hearing on June 30, 2014, the court certified the class and approved the settlement. The court rejected the objection to the allocation of the settlement consideration, finding that an equal allocation was fair and that any functionally lesser share of the consideration to be received by the Appraisal Claimants would result from a decision on the award of attorneys' fees and expenses, not from the

4

allocation of the settlement consideration. The court took the request for attorneys' fees and expenses under advisement.

## II.  LEGAL ANALYSIS

"'It is beyond dispute that litigants in Delaware are generally responsible for paying their own counsel fees,' absent special circumstances or a contractual or statutory right to receive fees." *Scion Breckinridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686 (Del. 2013) (quoting *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 421 (Del. 1994)). "It is also well established that a Chancellor or Vice Chancellor, 'under his equitable powers, has latitude to shift attorneys' fees.'" *Id.* (quoting *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1222 (Del. 2012)).

> Circumstances where a Vice Chancellor may use his equitable powers to award fees outside of an express statutory authorization or a contractual fee-shifting provision include, but are not limited to: (1) the presence of a common fund created for the benefit of others; (2) where the judge concludes a litigant brought a case in bad faith or through his bad faith conduct increased the litigation's cost; and (3) cases in which, although a defendant did not misuse the litigation process in any way, . . . the action giving rise to the suit involved bad faith, fraud, conduct that was totally unjustified, or the like and attorney's fees are considered an appropriate part of damages.

*Id.* at 686-87 (footnotes and internal quotation marks omitted).

"Under the 'common benefit' exception [to the general rule that a party must pay its own counsel fees], a litigant may . . . receive an award of attorneys' fees if: (a) the action was meritorious at the time it was filed, (b) an ascertainable group received a substantial benefit, and (c) a causal connection existed between the litigation and the benefit." *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d

1084, 1089 (Del. 2006). When the benefit takes the form of a common fund, the "common fund" exception "enables a litigant who succeeds in conferring a monetary benefit upon an ascertainable class of individuals to recover costs from the fund that he or she has created." *Id.* at 1090. These fee-shifting doctrines are "founded on the equitable principle that those who have profited from litigation should share its costs." *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996). "Otherwise, 'persons who obtain the benefit of a lawsuit without contributing to its cost [freeriders] are unjustly enriched at the successful litigant's expense.'" *Id.* (alteration in original) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

The power to award fees for a common fund or benefit "is a flexible one based on the historic power of the Court of Chancery to do equity in particular situations." *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1166 (Del. 1989). The prerequisites to a fee award under these doctrines are necessary but not sufficient. Put differently, there are circumstances where a litigant will have filed a meritorious action and played a causal role in creating a benefit for a particular class, and yet still not be awarded fees and expenses for the effort. *See, e.g.*, *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 789 A.2d 1216, 1217 (Del. Ch. 2001) (denying fee award to hostile bidder whose litigation efforts otherwise met requirements for award under common benefit doctrine), *aff'd sub nom. Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959 (Del. 2003); *In re Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *1 (Del. Ch. Nov. 27, 1990) (same). When declining to award fees and expenses to a litigant who otherwise meets the requirements of the common benefit doctrine, Delaware courts have considered the

6

potential for the litigant's interests to diverge from those of the class. *See, e.g.*, *Mentor Graphics*, 789 A.2d at 1227; *Dunkin' Donuts*, 1990 WL 189120, at \*9. The decisions also have evaluated whether a fee award would serve public policy goals, such as incentivizing plaintiffs' counsel to police fiduciary wrongdoing. *See, e.g.*, *Mentor Graphics*, 789 A.2d at 1230-31; *Dunkin' Donuts*, 1990 WL 189120, at \*10.

The controlling Delaware Supreme Court authority governing fee awards in common fund or benefit situations is *Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142 (Del. 1980). The *Sugarland* decision identifies factors for this court to consider when awarding fees and expenses for the creation of a common fund or benefit, including "whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof." *In re Plains Res. Inc.,* 2005 WL 332811, at \*3 (Del. Ch. Feb. 4, 2005); *accord Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980) (explaining that Delaware public policy is to compensate counsel "for the beneficial results they produced" and requiring both a meritorious claim and "a causal connection to the conferred benefit"). In *Sugarland*, the Delaware Supreme Court relied on this factor to reduce an attorneys' fee award. The Court of Chancery had awarded the petitioners 20% of the benefit obtained in the form of a higher price for the corporation's property, but the Delaware Supreme Court held that the petitioners could not claim "full credit" for the entire price increase. *Id.* at 151. The high court split the benefit into its component parts: the initial price increase and the later price increase. For the first, the Delaware Supreme Court agreed that the petitioners were responsible for 100% of the benefit and affirmed the 20% figure. *Id.* For the second, the Delaware Supreme Court noted that the higher

7

price resulted from both the petitioners' efforts and from a competitive bidding process and market dynamics and held that the petitioners only should receive 5% of the later benefits. *Id.*

*Sugarland* did not break new ground by limiting a fee award in a shared-credit scenario to the benefits conferred by counsel seeking the award. *See, e.g.*, *Aaron v. Parsons*, 139 A.2d 365, 367 (Del. Ch.) ("[C]ounsel for plaintiffs are entitled to be compensated for the part played by this suit insofar as it contributed to the benefits received by the corporation in the settlement."), *aff'd*, 144 A.2d 155 (Del. 1958). Since *Sugarland*, Delaware decisions consistently have recognized that multiple factors may contribute causally to the creation of a common fund or benefit. It may result from a combination of litigation effort by representative counsel and the operation of market forces.[1] It may result from litigation counsel pressing claims in parallel with efforts by other corporate actors, such as a special transaction committee, special litigation committee, or other committee of independent directors.[2] It may result from the

---

[1] *See, e.g.*, *Sugarland*, 420 A.2d 142 (competitive bidder for assets); *In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523 (Del. Ch. Dec. 9, 2011) (potential competing bidder for corporation); *In re NCS Healthcare, Inc. S'holders Litig.*, 2003 WL 21384633 (Del. Ch. May 28, 2003) (topping bidder); *Mentor Graphics*, 789 A.2d 1217 (same); *In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353 (Del. Ch. 1999) (same), *aff'd sub nom. First Interstate Bancorp v. Williamson*, 755 A.2d 388 (Del. 2000) (TABLE); *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 727 A.2d 844 (Del. Ch. 1998) (same); *Dunkin' Donuts*, 1990 WL 189120 (same); *In re Anderson Clayton S'holders' Litig.*, 1988 WL 97480 (Del. Ch. Sept. 19, 1988) (Allen, C.) (same); *In re Maxxam Gp., Inc. S'holders Litig.*, 1987 WL 10016 (Del. Ch. Apr. 16, 1987) (Allen, C.) (same).

[2] *See, e.g.*, *In re Quest Software Inc. S'holders Litig.*, 2013 WL 5978900 (Del. Ch. Nov. 12, 2013) (special transaction committee); *In re Emerson Radio S'holder Deriv. Litig.*, 2011 WL 1135006 (Del. Ch. Mar. 28, 2011) (audit committee); *In re Cox Radio, Inc. S'holders Litig.*,

aggregated pressure of different teams of representative counsel litigating in different jurisdictions.[3] It may result from a combination of efforts by representative counsel and other lawyers representing parties who did not sue in a representative capacity.[4] In a dynamic and generative world filled with creative and resourceful litigants and lawyers, this list is not (and could never be) exhaustive. Whatever the scenario, plaintiffs' counsel only should receive fees for the portion of the benefit to which they causally contributed.

This case involves an obvious and self-pricing benefit: $10,725,000 in cash. Two causal factors contributed to the creation of the benefit: the appraisal proceeding and the Plenary Action. If the same counsel had litigated a combined appraisal proceeding and

---

2010 WL 1806616 (Del. Ch. May 6, 2010) (special transaction committee), *aff'd*, 9 A.3d 475 (Del. 2010) (TABLE); *Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370 (Del. Ch. 2010) (same); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604 (Del. Ch. 2005) (same); *In re AXA Fin., Inc. S'holders Litig.*, 2002 WL 1283674 (Del. Ch. May 22, 2002) (same); *Dow Jones & Co. v. Shields*, 1992 WL 44907 (Del. Ch. Mar. 4, 1992) (same); *Zlotnick v. Metex, Inc.*, 1989 WL 150767 (Del. Ch. Nov. 14, 1989) (same); *In re Josephson Int'l, Inc. S'holders Litig.*, 1988 WL 112909 (Del. Ch. Oct. 19, 1988) (same); *Fox v. Chase Manhattan Corp.*, 1986 WL 673 (Del. Ch. Jan. 9, 1986) (special litigation committee); *see also Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018 (Del. Ch. Aug. 30, 2007) (giving plaintiffs' counsel partial credit for filing derivative action that eventually led to controller's decision to effectuate a going-private transaction).

[3] *See, e.g.*, *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 418-19 (Del. 2010) (evaluating causal roles of California action and Delaware action); *In re Allion Healthcare Inc. S'holders Litig.*, 2011 WL 1135016, at *8 (Del. Ch. Mar. 29, 2011) (evaluating causal roles of New York action and Delaware action); *In re Coleman Co. S'holders Litig.*, 750 A.2d 1202, 1212-13 (Del. Ch. 1999) (reducing fee award for class counsel from 30% to 10% where counsel "largely piggy-backed" on settlement achieved by large stockholder); *Mut. Shares Corp. v. Tex. Air Corp.*, 1987 WL 18105, at *3 (Del. Ch. Sept. 30, 1987) (awarding plaintiffs' counsel $3 million where claimed benefit of $41 million was partly caused by the efforts of counsel in a parallel action who "did all the considerable discovery and prepared exhaustive briefs").

[4] *See, e.g.*, *Sutherland v. Sutherland*, 2014 WL 3906500 (Del. Ch. July 31, 2014); *Smith, Katzenstein & Jenkins LLP v. Fid. Mgmt. & Research Co.*, 2014 WL 1599935 (Del. Ch. Apr. 16, 2014); *Mentor Graphics*, 789 A.2d 1217.

plenary action from start to finish, I would have no difficulty awarding fees and expenses for the aggregate effort in both proceedings based on the total benefit conferred.[5] In this case, however, it is necessary first to determine how credit for the benefit should be allocated between the appraisal proceeding and the Plenary Action. Having done so, this decision awards $2,250,000 to Plenary Counsel for their role in creating the benefit. Because the Appraisal Claimants were content to pursue only their own interests and did not undertake to serve the interests of the class as a whole, they lack standing to obtain a fee award for Appraisal Counsel's role in creating the benefit.

## A. The Allocation Of Causal Credit

The $10,725,000 benefit ultimately achieved in the Plenary Action resulted from the consecutive efforts of different litigants. For purposes of analysis, this decision breaks down the settlement consideration into two tranches: (i) an initial tranche attributable to the difference between the $2.05 deal price and the fair value of $4.67 per

---

[5] Surprisingly, there does not appear to be an extant decision that actually has done this, although that lacuna seems likely the product of limited research abilities and the potential for such awards to have been memorialized in secluded orders, rather than more easily located opinions. There are, however, Delaware decisions standing generally for the proposition that a court can award fees and expenses for multiple actions where they constituted parts of a single, unified campaign. *See Garretson v. Garretson*, 306 A.2d 737, 742 (Del. 1973) (finding the subsequent proceedings to be an extension of the earlier action and awarding attorneys' fees); *Cohen v. Cohen*, 269 A.2d 205, 207 (Del. 1970) (treating "the three separate actions as in fact one continuous piece of litigation which ultimately resulted in a settlement of the differences of the parties" and affirming the award of "fees based upon the entire scope of the litigation"); *Sutherland*, 2014 WL 3906500, at *5 (treating litigation as a continuous whole and awarding fees when stockholder individually pursued a Section 220 action and then later brought fiduciary duty claims); *Reis v. Hazelett Strip-Casting Corp.*, C.A. No. 3552–VCL, at 2 (Del. Ch. Feb. 22, 2011) (ORDER) (awarding attorneys' fees and expenses that included expenses incurred in a Vermont probate court action that led to the Delaware action).

10

share as determined in the appraisal proceeding and (ii) a second tranche for the consideration exceeding $4.67 per share.

The Appraisal Claimants contributed causally to the first tranche. In the appraisal proceeding, this court determined the going-concern value of Orchard and decided how that value should be allocated among the common and preferred stockholders given the preferred stock's stated liquidation preference of approximately $25 million. *Appraisal of Orchard*, 2012 WL 2923305, at *9. The court ruled that the fair value of Orchard's common stock at the time of the merger was $4.67 per share, more than double the merger consideration of $2.05 per share. *Id.* at *23. In the Plenary Action, plaintiffs' counsel benefitted from these rulings. They argued that collateral estoppel required the court to find quasi-appraisal damages based on the $4.67 per share appraisal valuation, and in the summary judgment opinion, this court noted that with respect to fair price, "the appraisal decision's holding that the fair value of Orchard was $4.67, more than two times the merger price of $2.05, is certainly evidence of financial unfairness." *Orchard Enters.,* 88 A.3d at 30. This opinion further noted that if the plaintiffs succeeded in establishing liability, and if a quasi-appraisal damages remedy was awarded, then the amount of damages per share would be the difference between the $4.67 per share determination in the appraisal proceeding and the deal price. *Id.* at 48.

By establishing that Orchard's fair value per share of common stock was $4.67, the Appraisal Claimants played a significant role in generating the benefits conferred by the settlement. Although this figure did not operate as a floor for the recovery in the Plenary Action, it raised the bar. The question is how much credit to give the Appraisal

11

Claimants for the portion of the settlement consideration represented by the difference between $4.67 per share and $2.05 per share.

In the two most common shared-credit scenarios—those involving topping bidders or special committees—the actor not principally responsible for generating the benefit appears to have been credited with 20% to 25% of the benefit conferred.[6] Because the application of the *Sugarland* factors is a discretionary exercise, the awards have a high degree of variability, and the rationales for the amounts are sometimes opaque. There is no science to fee awards, and even though the result is expressed as a number, the process does not lend itself to mathematical precision. The range of 20% to 25% is the best this court can do in an effort to follow precedent.

For purposes of the portion of the settlement consideration attributable to the difference between the $2.05 deal price and $4.67 per share, Plenary Counsel was the primary actor who obtained the value differential for the members of the class. From the standpoint of the class, Appraisal Counsel was a secondary actor: Appraisal Counsel

---

[6] *See, e.g.*, *Cox Radio*, 2010 WL 1806616 (awarding approximately 25% credit to secondary actor); *In re Prodigy Commc'ns Corp. S'holders Litig.*, 2002 WL 1767543 (Del. Ch. July 26, 2002) (awarding approximately 20% credit to secondary actor); *Zlotnick*, 1989 WL 150767 (awarding approximately 24% credit to secondary actor); *Josephson*, 1988 WL 112909 (giving secondary actor credit for approximately 27% of the benefit conferred); *see also Sugarland*, 420 A.2d at 151 (awarding counsel a fee of 5% of the incremental value achieved through a competitive bidding process where counsel obtained a preliminary injunction that led to the auction and a fee of 20% of the benefits solely attributable to plaintiffs' counsel, implying that counsel was credited with 25% of the benefit conferred by the incremental value achieved in the shared-credit phase); *Franklin Balance Sheet*, 2007 WL 2495018, at *13 (awarding counsel a fee of 15% of the initial $23.5 million in value, but only a fee of 5% of the remaining incremental benefit because plaintiffs' counsel were not the sole cause of the incremental benefit, implying that counsel was credited with 33% of the benefit achieved in the shared-credit phase).

played a contributory role, but without Plenary Counsel suing on behalf of the class, the other minority stockholders would have gotten nothing.  By analogy to the bidder and special committee cases, Plenary Counsel receives credit for 80% of the benefit conferred on the other minority stockholders by the increase from $2.05 per share to $4.67 per share.  The Appraisal Claimants receive credit for 20% of that benefit.

Plenary Counsel deserves sole credit for the second tranche of settlement consideration, which represents amounts in excess of $4.67 per share.  They alone pursued a rescissory damages claim based on the Orchard/Sony Merger.  The Appraisal Claimants did not seek discovery covering the time period when the Orchard/Sony Merger took place.  They did not seek to intervene in the Plenary Action to take over the litigation or assist Plenary Counsel.  The Appraisal Claimants chose to rely exclusively on Plenary Counsel to prosecute the fiduciary duty claims and obtain any amounts in excess of $4.67 per share.

As of the date of the Merger, there were 6,378,252 shares of Orchard common stock outstanding.  The defendants, who are excluded from the class, held 3,186,161 shares.  The Appraisal Claimants held 604,122 shares.  The other minority stockholders held 2,587,969 shares.  The increase from $2.05 per share to $4.67 per share therefore resulted in a total benefit to the other minority stockholders of $6,780,479.  Plenary Counsel is responsible for 80% of this benefit, which equals $5,424,383.  The Appraisal Claimants are responsible for 20% of this benefit, which equals $1,356,096.

Subtracting the portion of the settlement consideration attributable to the increase from $2.05 per share to $4.67 per share leaves remaining consideration of $3,944,521.

13

Of this amount, $357,036 went to the Appraisal Claimants, and $3,587,485 went to the other minority stockholders. Plenary Counsel is solely responsible for the entire amount.

In total, Plenary Counsel is responsible for conferring a benefit of $9,368,904. The Appraisal Claimants are responsible for conferring a benefit of $1,356,096. Although this decision expresses this amount in terms of specific dollar figures, readers should not be fooled by an illusion of false precision. At bottom, the amounts represent a discretionary allocation of causal credit for the settlement fund.

## B. A Reasonable Fee Award For Plenary Counsel

For the benefits conferred by the settlement, Plenary Counsel has requested an award of $3,250,000, inclusive of approximately $132,000 in litigation expenses and $12,500 in co-lead plaintiffs' awards. That amount represents roughly 30% of the total settlement consideration of $10,725,000. The figure rises to 35% of the $9,368,904 for which this decision gives Plenary Counsel causal credit. For conferring this benefit, this decision awards Plenary Counsel $2,250,000.

When awarding fees, the Court of Chancery "must make an independent determination of reasonableness." *Goodrich*, 681 A.2d at 1045-46. The court considers the factors laid out in *Sugarland* when determining the amount of a reasonable award. *See Sugarland*, 420 A.2d at 149-50. In *Sugarland*, the factors appear diffusely throughout the opinion. *See id.* The Delaware Supreme Court recently concisely summarized them as follows: "1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the

14

standing and ability of counsel involved." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012).

The Delaware Supreme Court noted in *Americas Mining* that "Delaware courts have assigned the greatest weight to the benefit achieved in litigation." *Id.* Later in that decision, the Delaware Supreme Court reiterated that "our holding in *Sugarland* assigns the greatest weight to the benefit achieved in the litigation" and instructed that "[w]hen the benefit is quantifiable, . . . *Sugarland* calls for an award of attorneys' fees based upon a percentage of the benefit." *Id.* at 1259. After surveying a range of precedent, the Delaware Supreme Court observed that "Delaware case law supports a wide range of reasonable percentages for attorneys' fees, but 33% is the very top of the range of percentages." *Id.* (internal quotation marks omitted). The Delaware Supreme Court then provided guidance on how this court should approach the percentage-of-benefit analysis by noting with approval that this court "has a history of awarding lower percentages of the benefit where cases have settled before trial" and grouping the percentages into categories based on the stage at which the litigation settled. *Id.*

> When a case settles early, the Court of Chancery tends to award 10-15% of the monetary benefit conferred. When a case settles after the plaintiffs have engaged in meaningful litigation efforts, typically including multiple depositions and some level of motion practice, fee awards in the Court of Chancery range from 15-25% of the monetary benefits conferred. . . . Higher percentages are warranted when cases progress to a post-trial adjudication.

*Id.* at 1259-60 (footnotes omitted). Selecting an appropriate percentage requires an exercise of judicial discretion. *Id.* at 1261.

15

The Plenary Action settled two months before trial. While there are outliers, a typical fee award for a case settling at this stage of the proceeding ranges from 22.5% to 25% of the benefit conferred. An award amounting to 22.5% of the $9,368,904 benefit conferred equals approximately $2,108,000. An award amounting to 25% of the $9,368,904 benefit conferred equals approximately $2,342,000. An award of $2,250,000 falls comfortably within this range.

Plenary Counsel asks for a higher proposed percentage of 30% by contending that the benefit obtained in this case is "exceptional." This is a recurring argument: Every plaintiffs' lawyer seeking fees seems to believe that the benefit he achieved is exceptional. That is understandable as a matter of human nature, and perhaps there will be an exceptional case someday that truly merits a substantial upward departure from the percentage awards suggested by precedent. But from a systemic standpoint, departures from the precedential ranges should be rare.

Using ranges of percentages that increase depending on the stage of the litigation, as described by the Delaware Supreme Court in *Americas Mining*, counteracts a natural human tendency towards risk aversion. Just as it is human nature to regard your personal accomplishments and performance as above-average (even exceptional), it is human nature to be risk-averse. For plaintiffs' counsel, risk aversion manifests itself as a natural tendency to favor an earlier bird-in-the-hand settlement that will ensure a fee, rather than pressing on for a potentially larger recovery for the class at the cost of greater investment

and with the risk of no recovery.[7]  If counsel can take the lesser bird-in-the-hand and get a greater percentage from the court, then the incentive to press on is undermined.  The reward for an exceptional result comes not from a special appeal for case-specific largesse, but rather from the percentage calculation itself.  A percentage of a low or ordinary recovery will produce a low or ordinary fee; the same percentage of an exceptional recovery will produce an exceptional fee.  *See Ams. Mining*, 51 A.3d at 1259 (explaining that the "common fund is itself the measure of success").  The wealth proposition for plaintiffs' counsel is simple:  If you want more for yourself, get more for those whom you represent.

---

[7] *See Emerson Radio*, 2011 WL 1135006, at *4 ("Awarding increasing percentages helps offset representative counsel's natural incentive to shirk."); *see also* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney:  The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 690 (1986) ("[P]laintiff's attorneys have an incentive to settle prematurely and cheaply when they are compensated on the traditional percentage of the recovery basis."); Alon Harel & Alex Stein, *Auctioning for Loyalty:  Selection and Monitoring of Class Counsel*, 22 Yale L. & Pol'y Rev. 69, 71 (2004) ("The class attorney's egoistic incentive is to maximize his or her fees—awarded by the court if the action succeeds—with a minimized time-and-effort investment.  This objective does not align with a both zealous and time-consuming prosecution of the class action, aimed at maximizing the amount of recovery for the class members.").  For now-classic treatments of this problem, see Kevin M. Clermont & John D. Currivan, *Improving on the Contingent Fee*, 63 Cornell L. Rev. 529, 543-46 (1978); Geoffrey P. Miller, *Some Agency Problems in Settlement*, 16 J. Legal Stud. 189, 198–202 (1987); and Murray L. Schwartz & Daniel J.B. Mitchell, *An Economic Analysis of the Contingent Fee in Personal-Injury Litigation*, 22 Stan. L. Rev. 1125, 1133-39 (1970).

The other *Sugarland* factors support the reasonableness of a $2,250,000 fee. Plenary Counsel expended significant resources and effort prosecuting a complex case. They reviewed over 180,000 pages of documents, took or defended eight depositions, briefed and argued a motion to compel, briefed and argued a motion for summary judgment, and served opening and rebuttal expert reports. Their standing and ability are not challenged. Unlike the now-ubiquitous pre-closing expedited challenges to mergers that are routinely settled with supplemental disclosures, Plenary Counsel did not enter the case with a ready-made exit. Plenary Counsel faced risk in pursuing a damages remedy, including the realistic possibility that Plenary Counsel would receive nothing for their time and effort.

Plenary Counsel report spending 3,197 hours. Unlike the hours claimed in many fee applications, this is not a facially excessive or preposterous figure. After netting out expenses of approximately $132,000 and co-lead plaintiffs' awards of $12,500, the fee award equates to an implied hourly rate of approximately $658.59.

> Fee awards . . . function as *ex post* judgments that will have the effect of either encouraging or discouraging future lawsuits. It will encourage them if it offers plaintiffs' lawyers the opportunity to make more money than they would make doing something else, that is, their lost opportunity cost. For most lawyers, opportunity costs are measured by their hourly rate. If the fee is large enough to cover both their lost opportunity costs and the risks associated with bringing the suit, as well as provide a premium, it should induce monitoring behavior. . . . Similarly, the greater the fee, without regard to the number of hours invested, the greater the incentive for lawyers to settle the lawsuit efficiently. . . . This Court has proceeded in the past on the unstated premise that awarding large fees will necessarily produce the incentives of encouraging meritorious suits and encouraging efficient litigation. But a point exists at which these incentives are produced, and anything above that point is a windfall.

*Seinfeld v. Coker*, 847 A.2d 330, 333-34 (Del. Ch. 2000). An effective hourly rate of $658.59 for the timekeepers in this action strikes me as a reasonable level of compensation for a case of this nature in this jurisdiction. It is above what I would expect the blended hourly rate to be for a team of partners, associates, and paralegals working on an hourly basis, and it therefore provides a premium to induce monitoring behavior and compensate Plenary Counsel for their risk. At the same time, the level of compensation is not so high—again compared to lawyers in this jurisdiction working on a non-contingent hourly basis—as to represent an unwholesome windfall that would encourage the filing of non-meritorious and socially costly suits.

## C.     No Fee Award For The Appraisal Claimants

The Appraisal Claimants seek an award of $767,445.58, representing reimbursement of attorneys' fees for Appraisal Counsel of $598,015.94 and expenses of $169,429.64 for the appraisal proceeding. At most, in my view, the Appraisal Claimants would be entitled to an award of $325,463.04. That figure takes the benefit of $1,356,096.00 that this decision has found to have resulted causally from the appraisal proceeding and awards the Appraisal Claimants the same percentage implied by the fee award to Plenary Counsel (24%). In my view, however, the Appraisal Claimants lack standing to recover any amount because they did not pursue a class-wide recovery on behalf of the other minority stockholders. They were content to serve themselves, and they should be left where they stand.

Not everyone who contributes to a benefit gets a fee award. The classic example is a hostile bidder who owns a toehold stake in the target corporation and pursues breach

19

of fiduciary duty litigation against the target directors. Even when the bidder's litigation generates relief that contributes causally to the sale of the target corporation to a third party at a premium, thereby meeting the requirements for a fee award, the bidder lacks standing to recover its legal fees under a common fund or benefit theory. *See Mentor Graphics*, 789 A.2d at 1217; *Dunkin' Donuts*, 1990 WL 189120, at *1. A stockholder plaintiff who monitors the bidder's litigation efforts is entitled to a fee award. *See supra* note 1 (collecting cases).

In denying standing to hostile bidders, Delaware decisions have identified two factors that override the bidder's *prima facie* showing of entitlement to a fee award: (i) the bidder's pursuit of personal interests potentially at odds with those of the class, and (ii) the absence of any need to incent a bidder to bring litigation to police fiduciary misconduct. On the first issue, "bidders have economic interests that are inherently and structurally in conflict with the target company's stockholders' interest in receiving maximum available value." *Mentor Graphics*, 789 A.2d at 1227.

> A bidder's objective is to identify an underpriced corporation and to acquire it at the lowest price possible. It is a straightforward investment decision. When the bidder, as in the typical situation, owes no direct duty to stockholders, it has no obvious reason to try to "maximize shareholder value." Indeed, its interest, if successful, will minimize shareholder value. Stockholders, on the other hand, do not care if the bidder gets a "good deal," they want the most compensation available for their holding in the company.

*Dunkin' Donuts*, 1990 WL 189120, at *9.

On the second issue, there is no need to create an incentive for the bidder to file suit: "[T]he opportunity to acquire control at a price acceptable to a bidder is itself the

20

incentive for the bidder to absorb the cost of bringing the litigation." *Mentor Graphics*, 789 A.2d at 1231.

> In contrast, a stockholder-plaintiff who does not seek control will normally have no reason to incur litigation expenses that would far outstrip the benefit he or she would receive individually if the lawsuit were successful. *Only by assuring such a shareholder plaintiff that if successful its expenses will be reimbursed by all the beneficiaries (the corporation or the shareholder class), would that shareholder have any incentive to bring the litigation*.

*Id.* (emphasis added); *accord Dunkin' Donuts*, 1990 WL 189120, at *10 ("Awarding litigants fees and expenses provides a needed incentive to shareholders to bring therapeutic action on behalf of a large and diffused class of shareholders who do not have the organizational ability or funds to seek redress themselves."). Unlike diffuse stockholders, bidders "are not organizationally disadvantaged," and "the typical bidder is a well organized and well financed individual or small group of individual stockholders." *Dunkin' Donuts*, 1990 WL 189120, at *10. Bidders often "have vast resources that may be tapped to fund lawsuits necessary to advance their investment strategy." *Id.* "[I]t strains reason to contend that bidders need the added incentive of fee shifting." *Id.*

For appraisal petitioners who do not seek also to represent a class, both of the policy rationales that caused this court to deny a hostile bidder standing to pursue a fee award are present, albeit in weaker form. Delaware Supreme Court precedent recognizes that an appraisal proceeding benefits only those stockholders who perfect their appraisal rights, not the stockholders more broadly. "An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth

21

(fair value) of their shareholdings." *Cede & Co. v. Technicolor, Inc. (Technicolor Plenary I)*, 542 A.2d 1182, 1186 (Del. 1988). By statute, only the stockholders who perfected their appraisal rights receive the appraisal award. *See* 8 *Del. C.* § 262(e).

As with hostile bidders, the interests of appraisal claimants may diverge from those of the class. Appraisal claimants forgo the merger consideration, opting through the appraisal election to become unsecured creditors of the respondent corporation for the duration of the appraisal proceeding. As unsecured creditors, they may have interests that differ from those of stockholders who did not seek appraisal and who received the merger consideration, and those interests could cause counsel in the appraisal proceeding to make tactical or strategic choices that differ from what counsel would do if acting as a fiduciary for a broader class. The effect of capital lock-in may well be a net positive that, along with other features of appraisal, reduces agency costs when compared to traditional class actions and results in a more efficient corporation law. *See* Charles R. Korsmo & Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash. U. L. Rev. (forthcoming 2015), *available at* http://ssrn.com/abstract=2424935. This decision need not weigh in on that question. For present purposes, it is sufficient to note that, as with a hostile bidder, the interests of appraisal claimants can diverge from those of the class.

Also like hostile bidders, stockholders who opt for appraisal have ample incentive to bring the appraisal proceeding and absorb its cost. They do not need the prospect of fee awards to encourage them to pursue appraisal. To the extent some degree of cost-sharing mechanism might be desirable, the General Assembly has addressed the issue by

22

including one in the appraisal statute. *See* 8 *Del. C.* § 262(j). Under this provision, the fees and costs incurred by one appraisal claimant to litigate the proceeding can be allocated *pro rata* among all stockholders who perfected their appraisal rights. *Id.*

Both factors that guided the outcomes in the hostile bidder cases thus cut against giving standing to an appraisal claimant to seek a fee award. The analysis changes if the appraisal claimant elects to represent a class, thereby permitting other stockholders to benefit directly from the appraisal claimant's investment in the proceeding and any resulting informational assets. The Delaware Supreme Court has recognized that an appraisal claimant's efforts can benefit other stockholders *if the appraisal claimant seeks to represent other stockholders* on a class-wide basis. In *Technicolor Plenary I*, the Delaware Supreme Court considered whether a stockholder who had elected appraisal should have standing to pursue a breach of fiduciary duty claim. 542 A.2d 1182. The Delaware Supreme Court held that standing existed, at least in part because of the ability of an appraisal petitioner to uncover corporate wrongdoing and then sue to benefit the stockholders as a class:

> Experience has shown that the great majority of minority shareholders in a freeze-out merger accept the cash-out consideration, notwithstanding the possible existence of a claim of unfair dealing, due to the risks of litigation. With the majority of the minority shareholders tendering their shares, only shareholders pursuing discovery during an appraisal proceeding are likely to acquire the relevant information needed to pursue a fraud action if such information exists. Such shareholders, however, would not have any financial incentive to communicate their discovered claim of wrongdoing in the merger to the shareholders who tendered their shares for the consideration offered by the majority and, by tendering, have standing to file suit. Thus, to bar those seeking appraisal from asserting a later-discovered fraud claim may effectively immunize a controlling shareholder from answering to a fraud claim.

23

*Id.* at 1188-89 (citation omitted).

In my view, if an appraisal claimant opts to represent a class and ultimately achieves class-wide benefits based in part on the appraisal action, then it is appropriate to treat the appraisal proceeding and the breach of fiduciary duty action as a single campaign for purposes of awarding fees to plaintiffs' counsel. *See supra* note 5. By contrast, if a stockholder and its counsel pursue appraisal, uncover information that could support class-wide relief, but do not pursue plenary litigation, then they have passed up an obvious opportunity to benefit their fellow stockholders in favor of keeping the benefits they have achieved for themselves. By analogy to the hostile bidder cases, the appraisal claimant who does not seek to represent a class lacks standing to seek a fee award for contributing to the benefit that a subsequent class action confers.

In other contexts, Delaware courts have applied similar principles to deny standing to plaintiffs who pursued personal agendas at odds with the interests of other stockholders. One informative precedent is *Andra v. Blount*, 772 A.2d 183 (Del. Ch. 2000). There, Andra filed a lawsuit challenging a two-step, controlling-stockholder squeeze-out merger. She moved for expedited proceedings and sought a preliminary injunction on the theory that the first-step tender offer contained false and misleading disclosures, but then withdraw her injunction application and allowed the transaction to close without challenge. She declined to tender into the first-step tender offer, but other stockholders did, and the controller acquired sufficient shares in the tender offer to complete the second step via a short-form merger. Andra then perfected her appraisal rights and also resumed pursuit of her breach of fiduciary duty action. Chief Justice

Strine, then a Vice Chancellor, held that Andra could pursue a claim for unfair dealing, but lacked standing to pursue a claim for breach of the duty of disclosure. *Id.* at 188-90. The Chief Justice explained that, given how she proceeded, Andra had not been injured by any alleged disclosure violations. *Id.* at 188. He noted that, had Andra chosen to "actually press[] her preliminary injunction motion, perhaps it would be good policy to let her continue to litigate her disclosure-based claims, even though she decided not to tender." *Id.* at 189-90. "Andra, however, [stood] in a far different position. She had the opportunity to serve her fellow stockholders in that manner, but turned her back on it. Allowing her at this stage to press claims that do not involve injury to her would invite gamesmanship." *Id.* Notably, Andra was denied standing to pursue her claims, a consequence arguably more significant than the denial of standing to pursue a fee award.

The Chief Justice ruled similarly as Chancellor in *In re Aristotle Corp.*, 2012 WL 70654 (Del. Ch. Jan. 10, 2012). There, two stockholders perfected their appraisal rights and pursued appraisal proceedings after a short-form merger. Five months before the scheduled trial in the appraisal proceeding, the stockholders filed a complaint for breach of fiduciary duty in which they claimed that the controlling stockholder of Aristotle Corporation and the members of its board of directors breached their fiduciary duties by not disclosing all material facts in connection with the short-form merger. As a remedy, they sought quasi-appraisal damages equal to the difference between the fair value of their shares and the price of the merger—precisely the same remedy available in the appraisal proceeding. Despite filing a plenary action, the plaintiffs sought "to represent only themselves and not a class of other stockholders." *Id.* at *1.

Relying on *Andra*, the Chief Justice held that the plaintiffs lacked standing to pursue their breach of fiduciary duty claim:

> When a litigant files a new claim that, if proven, would not entitle it to any relief that it does not already have a right to receive, that litigant in my view has no proper standing. The petitioners here were not deprived personally of any right to dissent by any of the alleged disclosure inadequacies; they dissented based on what they knew already. To put it simply, the alleged disclosure inadequacies did not in any way impair the petitioners' ability to seek appraisal, yet that is the theory on which they ground their claim. Thus, they would have this court issue a merely advisory ruling in a genuine sense . . . .

*Id.* at *3 (footnotes omitted). In reaching this conclusion, the Chief Justice twice reiterated that the plaintiffs had "never sought to represent other investors." *Id.* at *2; *accord id.* at *2 n.20 ("Importantly, here the petitioners did not plead this case as a class action and they do not seek to bestow the benefits of the successful prosecution of their claims on any shareholders other than themselves."). As in *Andra*, the plaintiffs were denied standing to pursue their claims, not just standing to pursue a fee award.

Most recently, in *Crothall v. Zimmerman*, 94 A.3d 733 (Del. 2014), the Delaware Supreme Court reversed a decision by this court awarding attorneys' fees to an individual litigant who pursued derivative claims on behalf of a limited liability company. After this court ruled in favor of the plaintiff, but before the parties could reach agreement on an appropriate form of final judgment, the plaintiff "informed his counsel that he was abandoning the lawsuit and was no longer pursuing his claims." *Id.* at *1. He then sold his LLC units, which "deprived [him] of standing to continue in the fiduciary status he had undertaken as a derivative plaintiff." *Id.* The case was dismissed for lack of standing, and no final judgment on the merits was ever entered from which the

26

defendants could have appealed. *Id.* The plaintiff's counsel moved to intervene to pursue an application for attorneys' fees, which was granted, and this court subsequently awarded counsel fees in the amount of $300,000. On appeal, the Delaware Supreme Court reversed, holding that "[a] plaintiff who generates a favorable trial court decision on a closely contested issue of corporate governance but then abandons his claim and renders the decision moot before it becomes final has not created a corporate benefit." *Id.* at *3. What the plaintiff's litigation efforts instead enabled him to do was obtain a favorable personal settlement. *See id.* at *1 n.6.

None of these decisions are directly on point. They nevertheless suggest, at least to me, that a court of equity can deny a plaintiff standing to receive a fee award, regardless of whether the plaintiff otherwise can establish a *prima facie* case supporting an award, if the plaintiff has proceeded in a manner designed to benefit the plaintiff individually—rather than the class as a whole—and any benefit achieved for the class has happened as an incidental by-product of the plaintiff's self-interested pursuit. Whether a stockholder has filed an individual action or in a representative capacity is not dispositive. *See Tandycrafts*, 562 A.2d at 1167 (affirming award of fees to stockholder who pursued disclosure claim individually, rather than on a class basis, but obtained an injunction against a pending stockholder meeting, which benefitted all stockholders). The focus instead is on whether the plaintiff took steps to benefit other stockholders or the entity. Pursuing litigation on a representative basis provides strong evidence of such an intent, but it is not a requirement.

27

In this case, the Appraisal Claimants chose not to represent a class. They held a large stake in Orchard and did not need the incentive of a potential fee award to induce them to litigate the fair value of the common stock. Although discovery revealed information sufficient to support a breach of fiduciary duty action, they chose not to attempt to extend the benefits of their efforts to other stockholders. They were content with what they obtained for themselves. That was a perfectly acceptable choice, but it carries a consequence: Under the circumstances, the Appraisal Claimants and their counsel lack standing to obtain a fee award.

## D. The Co-Lead Plaintiff Awards

The Appraisal Claimants object in passing to permitting Plenary Counsel to pay awards to the co-lead plaintiffs. Delaware decisions have approved similar awards under similar circumstances.[8] The amounts are reasonable and will be paid out of Plenary Counsel's fee, so they do not harm the class. They have been fully disclosed and are not so large as to raise specters of conflicts of interest or improper lawyer-client entanglements.

---

[8] *See, e.g.*, *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2012 WL 1655538, at *8 (Del. Ch. May 9, 2012) (approving awards of $35,000, $20,000, and $7,500 for plaintiffs who gave depositions and other assistance); *Brinckerhoff*, 986 A.2d at 396 (approving payment of $100,000 to lead plaintiff who spent approximately 1,000 hours assisting with litigation); *Oliver v. Boston Univ.*, 2009 WL 1515607, at *1 (Del. Ch. May 29, 2009) (awarding $40,000 to lead plaintiff where he spent approximately 2,000 hours assisting with litigation); *Ryan v. Gifford*, 2009 WL 18143, at *14 (Del. Ch. Jan. 2, 2009) (approving award of $5,000 each to two plaintiffs); *Raider v. Sunderland*, 2006 WL 75310, at *2 (Del. Ch. Jan. 4, 2006) (noting Delaware courts' reluctance to grant awards but approving $42,000 for plaintiff who spent a total of 205 hours on litigation and incurred out-of-pocket expenses of $1,400).

28

## III.    CONCLUSION

Appraisal Counsel and Plenary Counsel each contributed causally, albeit to varying degrees, to a settlement that yielded $10,725,000 for Orchard's minority stockholders.  The Appraisal Claimants lack standing to seek a fee award for Appraisal Counsel.  Plenary Counsel is awarded $2,250,000 for their efforts.  After conferring with the other parties and Appraisal Counsel, Plenary Counsel shall submit a form of order to implement the rulings in this opinion.